ADOPTION OF A MINOR.

Suffolk. January 5, February 25, 1959. — March 6, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Adoption. Illegitimacy. Probate Court, Adoption.*

A Probate Court judge who heard on the merits a petition for adoption of a minor child and expressly referred to St. 1957, c. 184, revising G. L. c. 210, § 2A (E), reasonably treated the hearing as an appeal from a disapproval of the petition by the department of public welfare, even though such appeal was not taken by a formal document. [639]

Evidence would have warranted a finding that a doctor at whose office an infant, illegitimate when born, was left by his parents was his mother's agent to place him in the care and control of a married couple for adoption, and there was no violation of G. L. c. 119, § 6, as appearing in St. 1954, c. 646, § 1. [639]

Warranted findings by a judge of the Probate Court in a proceeding for adoption of an infant child, illegitimate when born, of parents who intermarried after the filing of the petition for adoption and then opposed it, although the mother had consented in writing to the adoption before the petition was filed and the father, a student, had participated in placing the child for adoption, justified the judge's conclusion that it was for the best interests of the child to be adopted by the petitioners, a childless couple of excellent character having adequate income and suitable facilities to give the child good care. [639]

The written consent of the father of an infant, illegitimate when born, to an adoption of the child, to which the child's mother consented in writing before the filing of the petition for adoption, was not required by G. L. c. 210, § 2, as amended through St. 1950, c. 737, § 1, as a condition precedent to the adoption, notwithstanding that the father acknowledged the child as his child and that while the adoption proceeding was pending and before the final decree therein the parents, both of whom appeared therein to oppose the adoption, intermarried and by virtue of c. 190, § 7, as amended, the child thereupon became legitimate. [639–640, 643–644]

PETITION for adoption, filed in the Probate Court for the county of Suffolk on April 6, 1956.

The case was heard by *Wilson, J.*

The case was argued in January, 1959, before *Ronan, Spalding, Counihan, Whittemore,* & *Cutter,* JJ., and afterwards was submitted on briefs to all the Justices except *Williams, J.*

*Albert R. Mezoff, (Nathan Fink* with him,) for the respondents.

*John J. Tobin,* for the petitioners.

CUTTER, J. This is a petition filed April 6, 1956, for the adoption of a minor boy, born in February, 1956. The department of public welfare eventually[1] filed a report disapproving the proposed adoption. The natural parents of the child were not married to each other at the time of the child's birth or when the petition was filed but were married November 30, 1956, some seven and one half months after the filing of the petition. They opposed the adoption, although the mother had consented in writing to the adoption before the filing of the petition for adoption. The probate judge by final decree on October 31, 1957, approved the adoption. The natural parents have appealed. The evidence is reported.

The facts are stated upon the basis of the judge's findings of material facts which are plainly justified by the evidence.

---

[1] General Laws, c. 210, § 5A (as amended through St. 1954, c. 649, § 2), requires that the department "shall submit to the court not later than thirty days after receipt of . . . notice [of the petition], or within such further time as the court may allow, such written report as will give the court full knowledge as to the desirability of the proposed adoption." Partly because of the illness of the investigator originally assigned, a final report was not made until August 28, 1957, nearly a year and a half after the filing of the petition.

The unmarried mother of the child, discovering that she was pregnant, went with the father of the child, in September, 1955, to consult a doctor. The doctor urged marriage. The father, a student then receiving G. I. aid of $110 a month, said that "under no circumstances" could he "possibly get married." The mother said she did not want to use the baby to force marriage then or in the future. She declined to deal with the usual State agencies and asked that the "doctor . . . refer the baby to some private family."

The doctor discovered that the petitioners, married for eight years and childless, were going to Sicily in the hope of finding a child there to adopt. The doctor discussed this with the child's mother while she was still in the hospital following the child's birth. The petitioners in the meantime had gone to Europe, but returned by air at once on receiving word that the child was available. On her discharge from the hospital, the mother and "the child's father left the new born baby at the home of the male petitioner's brother." (See comment, *infra*, on this finding.) The confinement expenses of the mother were paid by the petitioners. The "child's mother assented to the" adoption petition after being told that the paper she was signing was "the adoption paper," although the attorney did not want her to "see the names of the adopting parents." See *Erickson* v. *Raspperry*, 320 Mass. 333, 334.

The natural father and mother now live in a somewhat unsatisfactory apartment in a congested area. The father testified that he would plan to live for a time with his parents in a suburb of Boston, if the adoption should be in fact refused and if they should gain custody of the child. The father's income, while he remains a student and when first starting work, will be small compared to that of the petitioners.

The petitioners live in Winthrop and have adequate income and suitable facilities to enable them to give the child good care. Besides caring for the child, the female petitioner "keeps house for her husband, and a fourteen months old baby boy placed [there] . . . by the Catholic Charitable

Bureau." They are happily married, "regular church attendants and highly respected in their community."

The department's psychologist examined the child in the petitioners' house. She stated that the female petitioner "is to be commended for her loving and wise care of . . . [the child] when she had two babies to care for at one time," that the child "shows by his splendid development and contentment that he is secure in this home," and that the male petitioner "is . . . devoted to the children." Counsel for the natural parents conceded that he did not "know anything ill or bad about the" petitioners. There was testimony of a psychiatrist from the Children's Medical Center that "any child who has developed very nicely in a family in which he has lived for nineteen months suffers a severe set back to be changed in [*sic*] any other situation."

The judge concluded "that it is for the best interest of this little boy to be the adopted son of the petitioners, not merely for security but also for the moulding of character."

Relevant statutes governing adoption are set out in part in the margin.[2] Various questions are raised by these provisions and by G. L. c. 190, § 7 (as amended through St. 1943, c. 72, § 1), which provides that an "illegitimate child whose parents have intermarried and whose father has acknowledged him as his child . . . shall be deemed legiti-

[2] General Laws c. 210, § 2 (as amended through St. 1950, c. 737, § 1), reads: "A decree for such adoption shall not be made, except as hereinafter provided, without the written consent of the child, if above the age of twelve; . . . of the lawful parents or surviving parent; of the mother only of the child, if illegitimate . . . provided, that such written consent shall be dated and, if relating to a child under one year of age, shall be attested before a notary public . . . . Illegitimacy shall in no case be expressly averred upon the record. . . ." Section 2A, as amended by St. 1957, c. 184, reads: "No decree of adoption shall be entered for the adoption of a child below the age of fourteen until one of the following conditions has been met: . . . (E) The petition for adoption has been approved in writing by the department of public welfare . . . . Any petitioner aggrieved by the refusal of the department . . . to approve such petition after being requested to do so, may appeal such refusal to the probate court . . . which court shall make final determination as to the allowance or dismissal of the petition." See discussion of the 1957 amendment in Boston College Law School, Ann. Surv. Mass. Law, 1957, § 19.9. Chapter 119, § 6, as appearing in St. 1954, c. 646, § 1, reads in part: "No person other than a parent . . . shall place any child under sixteen years of age of whom he is not the legal guardian in the care or control of any other person not related to such child by blood or marriage for purposes of giving such child a home, or for board, or for adoption. . . ."

mate and shall be entitled to take the name of his parents to the same extent as if born in lawful wedlock."

1. The failure of the department of public welfare (see footnote 2, *supra*) to consent to the petition presents no obstacle to the adoption. Under G. L. c. 210, § 2A (E), as amended (see footnote 2, *supra*), an appeal to the Probate Court lies from the department's action. Nothing in the statute requires that such appeal be taken by any formal document. The trial judge, by an express reference to St. 1957, c. 184, reasonably treated the hearing on the merits of the adoption petition as such an appeal.

2. The judge's finding that the child's mother herself, accompanied by the child's father, "left the new born baby at the home of the male petitioner's brother" in a minor respect differs from the evidence, for the mother testified that she left the child at the doctor's office. This inadvertence is immaterial, for the judge would have been amply justified in finding that the doctor was the mother's agent to transfer the child to the petitioners. As the placement of the child for adoption thus was by both natural parents, the provisions of G. L. c. 119, § 6, as amended (see footnote 2, *supra*), were satisfied.

3. The probate judge's conclusion, that the adoption was for the best interests of the child, was justified. We must consider, however, an issue of law which does not appear to have been argued to the probate judge.

An illegitimate child acknowledged by the father becomes legitimate under G. L. c. 190, § 7, as amended, upon the intermarriage of the natural parents at least "from and after the time when the intermarriage becomes valid under the law." *Hopkins* v. *Hopkins*, 287 Mass. 542, 550. See *Loring* v. *Thorndike*, 5 Allen, 257, 263; *Monson* v. *Palmer*, 8 Allen, 551, 556; *Houghton* v. *Dickinson*, 196 Mass. 389, 391. Cf. *Lopes* v. *Downey*, 334 Mass. 161, 163. The father acknowledged this child on various occasions, notably by a petition for custody of the child filed on August 16, 1957. Because the child became legitimate about eleven months before the final decree, we must decide whether that decree could be

entered without the father's written consent, in view of G. L. c. 210, § 2, as amended (see footnote 2, *supra*). If the persons whose consent to the decree of adoption is required under § 2 are to be determined at the date of the decree, the consent of the natural father at that time may have become necessary. If the persons who must consent to the decree are to be determined at the date of the petition or upon the return of an order of notice under c. 210, § 4,[3] then the result may be different. This question was first considered in this court for its possible bearing upon the Probate Court's jurisdiction to enter the decree. See *Foster* v. *Everett*, 334 Mass. 14, 16; *Witzgall* v. *Witzgall*, 334 Mass. 365, 368.

Sections 3, 3A, 4, and 5 of c. 210 provide some exceptions from the requirements of such consent laid down in § 2. Sections 3 (as amended through St. 1955, c. 89) and 3A (inserted by St. 1953, c. 593, § 1) do not directly cover the present situation, although § 3 does indicate that the date of the petition, in certain cases at least, determines the persons to whom notice is required under § 4 and whose consent is necessary except as provided in § 5 (see e.g. the case of a father in prison or who has deserted his child, whose conduct or status as related to the date of the petition determines whether his consent to adoption is required). See also the brief discussion of the effect of certain events subsequent to the petition in *Barden* v. *Flannery*, 256 Mass. 140, 141–142. The successive amendments[4] of § 3, although they show

---

[3] Section 4 (as amended through St. 1953, c. 593, § 2) reads: "If the written consent required by sections two and three is not submitted to the court with the petition, the court shall, except in cases where a proceeding under section three A has determined that such consent and notice is not required, order notice by personal service upon the parties of an order of notice . . . ." Section 5 provides: "If, after such notice, a person whose consent is required does not appear and object to the adoption, the court may act upon the petition without his consent, subject to his right of appeal, or it may appoint a guardian ad litem with power to give or withhold consent."

[4] For example, the amendments of § 3 by St. 1945, c. 239 and c. 300; St. 1951, c. 674; St. 1952, c. 352; and St. 1953, c. 61, were apparently passed in part to change earlier statutory provisions construed in *Zalis* v. *Ksypka*, 315 Mass. 479, and *Broman* v. *Byrne*, 322 Mass. 578, 580–581. See Wasserman, Assent to Adoption, 37 Mass. L. Q. No. 3, p. 56; Rep. Jud. Council, 1952, 37–38. For earlier law see also Note, 15 B. U. L. Rev. 171. These amendments all seem to be directed to protecting the interests of the child. See *Erickson* v. *Raspperry*, 320 Mass. 333, 335; *Krakow* v. *Department of Pub. Welfare*, 326 Mass. 452, 455–456, and cases cited.

some recent relaxation of the legislative requirements of consents to adoptions by natural parents, also do not directly deal with the present case.

It may be argued that G. L. c. 190, § 7, has no necessary relation to adoption proceedings because it appears in a chapter of the General Laws relating to descent and distribution and because the section is usually thought of only in that connection. See e.g. 38 B. U. L. Rev. 299, 311–312. Section 7, however, has been applied in cases not involving the devolution of property. See *Monson* v. *Palmer*, 8 Allen, 551, 556, in which Hoar, J. (in considering whether children, deemed to be legitimate for other purposes, take the settlement of the father) said of a predecessor of § 7, "Its terms are as broad and general as the language affords. And we do not think there is such evidence that the intention of the Legislature was to confine their application to the single subject of the descent of property, as will authorize this court to interpret it in any narrower sense by implication, than that which the import of the language used naturally suggests." See also another legislative application of the broad policy behind § 7 in G. L. c. 46, § 13 (as amended through St. 1956, c. 342), relating in part to amendment of birth records of legitimatized children. There has been brought to our attention no indication whatsoever that the Legislature in framing the adoption provisions found in c. 210 has ever given any thought to the provisions of c. 190, § 7. We recognize, however, that § 7 carries out a broad legislative policy of relieving an illegitimate child, whose parents subsequently marry and whose father acknowledges him, from all the disabilities of birth out of wedlock and of placing the child on a parity with legitimate children for all purposes.

No prior Massachusetts case appears to decide the precise question here presented. Cf. *Erickson* v. *Raspperry*, 320 Mass. 333, 334. In other States, however, the question has been considered under statutes which vary somewhat from ours. See Annotation, 51 A. L. R. 2d 497, 503–509. Some jurisdictions hold that the consent of the natural father to

adoption is required where there has been legitimization of a child by the marriage of his natural parents and the acknowledgment of the child by the father.[5]  Decisions in other jurisdictions are consistent with the view that legitimization by intermarriage subsequent to the giving of consent to adoption by a mother, then unmarried, does not retroactively operate to make the father's consent necessary.[6]

In *Wyness* v. *Crowley*, 292 Mass. 461, 463–464, this court held that the consent of the natural mother, given before the filing of a petition under c. 210, § 2, could not be withdrawn after the filing of the petition without the consent of the probate judge.  See *Kalika* v. *Munro*, 323 Mass. 542, 543; Newhall, Settlement of Estates (4th ed.) § 24, pp. 74–75. See also *Harper* v. *Harper*, 329 Mass. 85, 88–89.  The effect of the *Wyness* case was thus to treat the date of the petition, with the prior consent of the natural mother upon it, as determining her consent, unless in the discretion of the court she was permitted to withdraw her consent.  See *Erickson* v. *Raspperry*, 320 Mass. 333, 335; *Ellis* v. *McCoy*, 332 Mass. 254, 258.

In the present case, the natural father participated in placing the child for adoption.  This probably does not impose an absolute estoppel upon him to oppose the adoption for the probate judge in his discretion could certainly permit him to oppose an adoption as not in the best interest of the child.  Cf. *Ellis* v. *McCoy*, 332 Mass. 254, 259.  At the time the mother's consent was given she alone had authority to speak for the natural parents under c. 210, § 2, and did so.  The father's consent then was not necessary.  See *Gibson, appellant*, 154 Mass. 378, 381–382; Annotation,

[5] *Adoption of Anderson*, 189 Minn. 85, 86 (but see *Adoption of Anderson*, 235 Minn. 192, 198–199).  *Adoption of Doe*, 231 N. C. 1, 8–9.  *Sklaroff* v. *Stevens*, 84 R. I. 1, 6–7.  *Harmon* v. *D'Adamo*, 195 Va. 125, 128–129.  *Re a Minor*, 191 Wash. 452, 457–458.  *Re Hope*, 30 Wash. 2d 185, 191–194.  See Merrill & Merrill, Toward Uniformity in Adoption Law, 40 Iowa L. Rev. 299, 330–331; Uhlenhopp, Adoption in Iowa, 40 Iowa L. Rev. 228, 246.  Cf. *Adoption of a Minor*, 155 F. 2d 870 (Ct. App. D. C.); *Chance* v. *Pigneguy*, 212 Ky. 430, 432–433.

[6] *Ex parte Combs*, 150 N. E. 2d 505.  *Davis* v. *Sears*, 35 S.W. 2d 99, 102–103 (Tex. Commn. App.).  *Adoption of Morrison*, 260 Wis. 50, 63–65. See *Royer Adoption*, 34 Del. Co. R. (Pa.) 402, 404.  See also *A.* v. *B.* 217 Ark. 844, 848–849;  Note, 31 Tulane L. Rev. 657, 658.

24 A. L. R. 416, 428. Cf. *Chambers's Case*, 221 Mass. 178, 179–180; *Plymouth* v. *Hey*, 285 Mass. 357, 359. The natural father's participation in the placement ought fairly to put him on no better basis, as of right, than the natural mother, who would not be allowed to withdraw her earlier consent except with the permission of the Probate Court. Her consent, conclusive when given, should be treated as binding on him as the other natural parent. Permission to withdraw that consent should be given by the probate judge only when the best interests of the child so dictate.

We give great weight to the considerations mentioned in the testimony (quoted above) of the psychiatrist from the Children's Medical Center. See also *Adoption of Morrison*, 260 Wis. 50, 63–65, which discusses this problem. When a child is placed by its parent for adoption in a good family the inevitable consequence will be that firm bonds of affection and confidence will rapidly arise on both sides. The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents who had their chance to take care of the child themselves and who themselves have created the unfortunate situation. The interests of the natural parents in such a case must be completely subordinated to the paramount interest of the child. Weight must also be given to the general tendency in recent amendments (see footnote 4, *supra*) of the adoption statutes to permit a constantly greater area of discretion to the Probate Court with respect to approving adoptions which will serve the best interests of the child. In the absence of any indication that the Legislature has ever had G. L. c. 190, § 7, specifically in mind when dealing with c. 210, § 2,[7] we hold that the consent

---

[7] The language of § 2, in its present form, had its origin in 1871 House Bill No. 243. Without explanation a comprehensive revision of existing adoption legislation was reported on April 17, 1871, in a new draft by the committee on probate and chancery. 1871 House Bill No. 297. The legislative history of this and subsequent amendments gives no clue to the reason for the form of the language.

of a father who was not a lawful parent at the child's birth or at the time when there is a default under c. 210, §§ 4 and 5, is not required by § 2, as a condition precedent to adoption.

We recognize that, in other connections, we have given weight to the interest of natural parents. *Richards* v. *Forrest*, 278 Mass. 547, 556. *Gordon* v. *Gordon*, 317 Mass. 471, 474–477. *Stinson* v. *Meegan*, 318 Mass. 459, 465–466. See *Beloin* v. *Bullett*, 310 Mass. 206, 210–211. Upon the novel and different circumstances here presented, these decisions are not controlling.

*Decree affirmed.*