GUARDIANSHIP OF A MINOR.

Suffolk.    March 19, 1973. — July 10, 1973.

Present: ROSE, GOODMAN, & ARMSTRONG, JJ.

*Guardian,* Of minor, Custody. *Parent and Child.    Minor.    Constitutional Law,* Due process of law.    *Words,* "Unfit."

The "unfitness" standard of G. L. c. 201, § 5, to deprive a parent of custody over a child, as construed by prior judicial decisions, is not unconstitutionally vague. [395-398] GOODMAN, J., concurring.

A mother, notified that a charitable agency sought permanent guardianship of her child, with custody because she was "unfit," was not irreparably harmed by an alleged lack of particularity in the notice where she could have moved under G. L. c. 231, § 70, for a statement of particulars and did receive sufficient information in answers to interrogatories. [398]

Findings by a judge of a Probate Court, including findings that the condition of the mother of a young boy "constitutes a threat to his safety while he is in her custody" and that she "lacks the capacity, stability, and motivation to provide appropriate maternal care" justified a conclusion of the judge that she was "unfit" to have custody of the boy within G. L. c. 201, § 5. [398]

PETITION filed in the Probate Court for the county of Suffolk on August 5, 1971.

The case was heard by *Keville,* J.

*Joel Copperman (Paula W. Gold* with him) for the appellant.

*William B. Duffy (George F. Parker, III,* with him) for Boston Children's Service Association, Inc.

ROSE, J.    This is an appeal from an interlocutory decree entered January 13, 1972, denying the appellant's motion to dismiss and from a final decree of the Probate Court entered February 7, 1972, finding the appellant to be an unfit mother and granting custody of her illegitimate minor son to the Boston Children's Service Association, Inc. (BCS). On August 5, 1971, BCS filed its petition for

custody pursuant to G. L. c. 201, § 5, as amended by St. 1961, c. 171.[1] On that date BCS was granted temporary guardianship of the child at an ex parte hearing. The final hearing was held on January 27, January 31 and February 1, 1972. The probate judge filed a report of material facts and the evidence is reported.

The appellant was one of ten children. Her father died when she was fifteen. The frequent illness of her mother caused her to have the responsibility of taking care of the home and her siblings. She left school in the ninth grade to go to hairdressing school and later to work as a hairdresser. When she was seventeen years old and still unmarried, she became pregnant. Her son was born on June 17, 1969.

Following his birth, the appellant moved into the Cathedral Housing Project where she resided, except for brief intervals, for the entire time the child was in her care.

Both mother and son have had a number of medical problems since the birth. The mother testified that her son had many illnesses either causing him to be treated at or confined to a hospital.

In April of 1970 he was burned on some pipes at home. She explained that he fell from his bed against a hot radiator. He suffered third-degree burns on one leg and lesser burns on his abdomen and perineum. As a result he was in the hospital for one month. In November, 1970, she placed him in foster care with BCS for a period of six weeks so that she might have a kidney ailment corrected, look for a job and find a better place to live. In December, 1970, not having found a job, she took him back to the same apartment. At this time she hoped to marry her boyfriend, age twenty-two, unemployed, with whom she shared an apartment from time to time. In February, 1971, she had what she described as a nervous breakdown. At that time

---

[1] "... The probate court may, upon the written consent of the parents or surviving parent, order that the guardian shall have such custody; and may so order if, upon a hearing and after such notice to the parents or surviving parent as it may order, it finds such parents, jointly, or the surviving parent, unfit to have such custody; or if it finds one of them unfit therefor and the other files in court his or her written consent to such order . . .."

her son was in the care of her boyfriend's mother, and her boyfriend had moved in to care for her. During this period she attempted suicide by taking an overdose of medicine. By June the child was back in her custody, her boyfriend was gone and the marriage plans were over.

In December of 1970 she began having seizures. In January, 1971, she had a seizure during which she lost consciousness. She left a hospital against medical advice in the spring of 1971. On June 11, 1971, she disclosed to a pediatrician who was examining her son that she had had a seizure that morning, was taking no medicine and seeking no medical assistance.

She called her social worker at BCS on June 28, 1971, with a plea that BCS accept the boy for foster care as, according to her social worker, she "found herself waking in the middle of the night with her hand around . . . [her son's] throat and that we must take . . . him into foster care." Her social worker further testified that she called the first thing the following morning and stated that if BCS "did not take . . . [her son] quickly from her she was going to kill him and that there would be nothing left of him to take." That day the child was placed by the mother with BCS and has not been in her custody since. Later on the same day welts on his legs, body and backside were observed. They disappeared within a week. A pediatrician, experienced in the care of foster children, examined him on July 9 and found him to be a "timid, shy, frightened, quiet boy . . . who made no social approaches, no words, no actions."

The mother testified that she has not had seizures since she was an in-patient in the psychiatric department of the University Hospital during a five-week period in November and December of 1971.

The probate judge in his report of material facts stated, "Although . . . [she] has both affirmed and denied that her seizures are epileptic a psychiatrist who saw her in February of 1971 described their causation as hysterical. It has been difficult for the court to find the true nature and prognosis of her illness and the specifics of the medical and

psychiatric care she has been receiving. . . . However, it is clear that during these episodes she has been unable to care for the child and her condition constitutes a threat to his safety while he is in her custody."

This appeal brings several issues before us. The appellant first argues that G. L. c. 201, § 5, as amended by St. 1961, c. 171, the statute under which this action has been brought, is unconstitutionally vague and is therefore in violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States. She argues that the standard "unfit" as used in the statute is "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . .," *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453; *Commonwealth* v. *Carpenter,* 325 Mass. 519, 521; and that the statute is not specific enough adequately to guide the courts in adjudication and to provide a satisfactory guide for an individual's future conduct. *Musser* v. *Utah,* 333 U. S. 95, 97. *Winters* v. *New York,* 333 U. S. 507.

We reject this argument. The "unfit" standard has been in our laws since 1873. St. 1873, c. 367. Through the process of judicial decision making, the standard has been defined with as much precision as the subject is susceptible of. See *Richards* v. *Forrest,* 278 Mass. 547; *Bottoms* v. *Carlz,* 310 Mass. 29; *Gordon* v. *Gordon,* 317 Mass. 471; *Stinson* v. *Meegan,* 318 Mass. 459. In *Richards* v. *Forrest, supra,* at 552-553, 554, the court said: "This petition is brought under G. L. c. 201, § 5. So far as here material, that section confers jurisdiction upon probate courts to order that the guardian shall have custody and care of the person of a minor if, upon a hearing, the parents are found 'unfit to have such custody.' This is a valid exercise of legislative power. *Chambers's Case,* 221 Mass. 178, 180. A strong word thus is used in the statute to describe parents from whom may be taken by order of the court the right to custody and care of their child. That word governs the power of the court to award the custody of the child to some one other than her parents. There is no statutory definition of the word 'unfit.' It therefore must be given its ordinary significance, having

due regard to the context. In general, the word means unsuitable, incompetent, or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Violence of temper, indifference or vacillation of feeling toward the child, or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects. . . . The unfitness of parents in this section of the statute must be determined with respect both to their own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections."

This is not the kind of situation where the Legislature can set out a precise legislative standard.[2] The intricacies and subtleties of the parent-child relationship cannot be governed by a minutely detailed legislative standard. The statute instead sets out a general standard, and relies on the wisdom and experience of the trial judge, allowing him flexibility to make a determination from the facts and personalities before him.

Thomas D. Gill, a judge of the Juvenile Court for the State of Connecticut, highlighted this idea when he wrote, "Such thoughtful and concerned critics who hold that the neglect statutes are dangerously vague and lack norms must consider the alternative dangers inherent in establishing criteria by statutory edict.

"The neglect statutes are concerned with parental behavior not as behavior per se, but only and solely as it adversely affects the child in those areas of the child's life about which the statutes have expressed concern. Each child embodies his own unique combination of physical, psychological, and social components; no child has quite

---

[2] Even the statutes from other jurisdictions (Wis. Sts. Ann. § 48.40; Minn. Sts. Ann. § 260.221) which the appellant cites as examples of more explicit standards provide a degree of flexibility and give a range of discretion to the trial judge.

the same strengths or weaknesses as another or exactly the same relationship with his family. The parental failure which markedly damages one child might leave another quite untouched. This interaction between the child and his family is the essence of a neglect situation, the imponderable which defies statutory constraint." Gill, *The Legal Nature of Neglect,* 6 NPPA J. 1, 5.

Reference is made by the appellant that the unconstitutional vagueness which she alleges afflicts c. 201, § 5, would be cured if the more specific standards of c. 119, § 24, could be read into it. The standards developed by the interpretation of unfitness by the Supreme Judicial Court over the many years of the existence of c. 201, § 5, are as exacting as and no broader than c. 119, § 24, read in light of the purposes of the statute as declared in c. 119, § 1.[3] The report of material facts indicates that the appellant poses a physical threat to the child. This is sufficient to find the mother unfit under whatever standard might be applied.[4]

In addition, the appellant's argument that the vagueness of this statute inhibits the manner that parents relate to

---

[3] "It is hereby declared to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development.

"The purpose of this chapter is to insure that the children of the commonwealth are protected against the harmful effects resulting from the absence, inability, inadequacy or destructive behavior of parents or parent substitutes, and to assure good substitute parental care in the event of the absence, temporary or permanent inability or unfitness of parents to provide care and protection for their children."

[4] General Laws, c. 119, § 24. "The Boston juvenile court, the Worcester juvenile court, the Bristol County juvenile court and the Springfield juvenile court or the juvenile sessions of any district court of the commonwealth, except the municipal and district courts located within the territorial limits of said juvenile courts, upon the petition of any person alleging on behalf of a child under the age of sixteen years within the jurisdiction of said court that said child is without necessary and *proper physical,* educational or moral *care* and discipline, or is growing up under conditions or circumstances damaging to a child's sound character development, or who lacks proper attention of parent, guardian with care and custody, or custodian, and whose parents or guardian are unwilling, incompetent or unavailable to provide such care, may issue a precept to bring such child before said court, shall issue a notice to the department, and shall issue summonses to both parents of the child to show cause why the child should not be committed to the custody of the department of public welfare or other appropriate order made . . ." (emphasis supplied).

their children is simply unfounded. We can perceive no way, nor has she shown us any, that this might come about.

The appellant further argues that the notice of the hearing of the permanent guardianship failed to state the grounds for unfitness with particularity, and that the lack of particularity caused her irreparable harm in the preparation of her case and thus denied her due process. She states that BCS's petition for permanent guardianship merely prayed that the petitioner "be appointed to that trust, with custody, the mother being unfit." We reject this argument also. The appellant might have filed a motion requesting that the court, pursuant to G. L. c. 231, § 70, order BCS to file a statement of particulars in order for her to obtain such specific information as she felt she needed. No such motion was filed in this action. Furthermore, the record is clear that the appellant did file interrogatories and received answers thereto which provided information for the preparation of her case.

The appellant also argues that the evidence is insufficient to hold that she is an "unfit parent" and thus BCS should not have been granted custody of her son. The probate judge, who had the opportunity to observe the demeanor of the witnesses before him and could thus weigh their credibility, made extensive and careful findings and in addition to his finding, cited earlier, that the condition of the appellant "constitutes a threat to his safety while he is in her custody," also found that she "lacks the capacity, stability, and motivation to provide appropriate maternal care . . .." After a review of the evidence before us we are unable to find him plainly wrong. We therefore reject this argument also.

The appellant raises other issues in her brief and supplemental brief, some of which were decided implicitly by this opinion, and the remainder of which we cannot review since they were not heard below. *Wood* v. *Dean,* 165 Mass. 559, 561-562. *Serabian* v. *Tatian,* 229 Mass. 191, 192. *Kagan* v. *Levenson,* 334 Mass. 100, 107.

*Decrees affirmed.*

GOODMAN, J. (concurring in result). I concur because, as pointed out in the majority opinion, the application of G. L. c. 119, §§ 1 and 24, would lead to the result reached in this case. See *Alegata* v. *Commonwealth,* 353 Mass. 287, 304. It seems to me that these legislative standards are more appropriate than such suggestions as may be found in the cases cited in the majority opinion, all of which involved determinations as to which of two competing individuals was entitled to custody rather than the application of a standard to a parent from whom, as in this case, an agency was attempting to take a child. The Legislature in establishing these standards (St. 1954, c. 646) seems to have anticipated the view expressed in *In Re Gault,* 387 U. S. 1, 18, that "unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle . . . [and that] [t]he absence of substantive standards has not necessarily meant that children [and parents] receive careful, compassionate, individualized treatment."