PETITION OF THE NEW ENGLAND HOME FOR LITTLE
WANDERERS TO DISPENSE WITH CONSENT TO ADOPTION.

Suffolk. January 6, 1975. — May 5, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Adoption. Constitutional Law,* Due process of law, Equal protec-
tion of laws. *Words,* "Best interests," "Care or custody," "Unfit."

Where an unwed mother voluntarily placed her child in an institu-
tion and over the subsequent ten-month period failed to take
effective steps to demonstrate either a consistent desire for custody
or an ability to care properly for the child if given custody, the
institution had "care or custody" of the child requisite for the
institution to bring a petition under G. L. c. 210, § 3, as amended
through St. 1972, c. 800, § 2, seeking to dispense with the moth-
er's consent to subsequent adoption of the child [633-639]; and the
best standard for decision in such a proceeding was the "best in-
terests" of the child as defined in § 3 [639-646]; such standard was
neither unconstitutionally vague nor in violation of the equal pro-
tection clause of the Fourteenth Amendment to the Federal Con-
stitution [646-647]. *Hennessey,* J., dissenting on the ground that
it had not been shown that the child was in the "care or custody"
of the institution so as to enable use of the "best interests" of the
child test, rather than a parental "unfitness" test.

PETITION filed in the Probate Court for the county of
Suffolk on April 23, 1973.

The case was heard by *Fitzpatrick,* J.

The Supreme Judicial Court granted a request for
direct appellate review.

*Benjamin D. Lewis* for the respondent.
*Robert C. Silver* for the petitioner.

KAPLAN, J. The New England Home for Little
Wanderers (Home), which had had custody of the
unmarried mother's child from about the time of its birth
ten months previously, filed a petition in the Probate

Court for Suffolk County on April 23, 1973, to dispense with the need for the mother's consent to a subsequent adoption of the child. The petition was under G. L. c. 210, § 3, as amended through St. 1972, c. 800, § 2. Subsections (b) and (c) of § 3 allow a licensed child care agency to commence such a proceeding with regard to any child in its "care or custody"; the court is to approve the petition if it finds that "the best interests of the child" will be served thereby, and in making this determination the court "shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and shall also consider the plan proposed by the . . . agency initiating the petition." [1]  In this case,

---

[1] "*Section 3.*   (*a*) Whenever a petition for adoption is filed by a person having the care or custody of a child, the consent of the . . . [parents] shall not be required if:   — . . . (ii) the court hearing the petition finds that the allowance of the petition is in the best interests of the child, as defined in paragraph (*c*).   (*b*) The department of public welfare or any licensed child care agency may commence a proceeding, independent of a petition for adoption, in the probate court . . . to dispense with the need for consent of . . . [a parent] to the adoption of a child in the care or custody of said department or agency. . . . The court shall issue a decree dispensing with the need for said consent . . . for adoption of such child subsequently sponsored by said department or agency if it finds that the best interests of the child as defined in paragraph (*c*) will be served by said decree. . . . (*c*) In determining whether the best interests of the child will be served by granting a petition for adoption without requiring certain consent as permitted under paragraph (*a*), the court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility and shall also consider the ability, capacity, fitness and readiness of the petitioners under paragraph (*a*) to assume such responsibilities.   In determining whether the best interests of the child will be served by issuing a decree dispensing with the need of consent as permitted under paragraph (*b*), the court shall consider the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition.   If said child has been in the care of the department or a licensed child care agency for more than one year, in each case irrespective of incidental communications or visits from his parents . . . there shall be a presumption that the best interests of the child will be served by granting a petition for

the Home's plan was to sponsor adoption of the child by a specific family. After a hearing at which the mother was represented and the facts were brought out, the probate judge granted the Home's petition. The mother appeals, attacking the court's application of § 3 as well as the constitutionality of that statute.

The mother's major argument is that, since the Home's custody of the child originated in a voluntary consent given by her, and since she later changed her mind and now wishes to keep the child, the court must decide the case, not by applying the standard of "best interests of the child" set out in § 3, but rather by bringing in the parental "unfitness" test used in suits under the guardianship laws to remove children from the custody of their parents. See G. L. c. 201, § 5.[2] In approaching the mother's contentions, it will be well first to set out the facts of the case as they appear from the probate judge's report of material facts; the evidence is not reported.

Finding she was pregnant, the mother entered the Crittenton Hastings House. There a social worker from the Home discussed with her possible alternatives for caring for the expected child. The mother said she planned to have the child adopted. Foster care was explained to her as an alternative which could provide time for her to make permanent plans for the child. After the birth of the child on June 28, 1972, the mother returned to the Crittenton for a short time and while there gave written con-

adoption as permitted under paragraph (a) or by issuing a decree dispensing with the need for consent as permitted under paragraph (b)."

[2] "Section 5. . . . The probate court may, upon the written consent of the parents or surviving parent, order that the guardian shall have . . . custody; and may so order if, upon a hearing and after such notice to the parents or surviving parent as it may order, it finds such parents, jointly, or the surviving parent, unfit to have such custody; or if it finds one of them unfit to have such custody; or if it finds one of them unfit therefor and the other files in court his or her written consent to such order. . . ."

sent to the Home's assuming care and custody of the child; she had by that time met the prospective foster parents with whom the Home was to place the child.

When she gave birth the mother was thirty years old and unmarried. Her mother was dead. She lived with her retired seventy-year old father and two unmarried brothers; her father was dependent for support on social security benefits and contributions from the brothers. Her employment since leaving high school after the second year had mostly been in factories. She returned to work in August, 1972, after the baby was born, but was laid off in April, 1973; at the time of the Probate Court hearing in January, 1974, she was still unemployed and was receiving unemployment compensation. She had a bank account of between $500 and $1,000, paid $18 a week toward the foster care of her child, had a car, and paid for the boarding of a horse which she owned.

During the period between the birth of the baby and filing of the petition by the Home, the mother consulted with the Home's social worker as well as with a family counselor. Her action, however, was vacillating and indecisive; no plan emerged with any definiteness that offered a realistic means by which she could raise and care for her child. Within a month of the baby's birth she seemed to reverse her previous wish and expressed a desire to keep the child. But she could only suggest vaguely that she would have a friend care for the child or that she would go on welfare; she had no job at the time, her father was refusing to allow her to bring the child into his household, and she had no crib or clothing for the child. About the same time she failed to show up at a meeting with the foster parents that was set to allow her to see the child as she requested. In August, by contrast, she made an unannounced visit to the child. The following month the social worker again met with her to discuss plans for the child, but although she was employed by this time her thoughts remained vague and unrealistic. Later in the fall, she had an attorney write a

letter to the Home saying she wished the child returned, but this was never followed up. In November she again failed to appear at a meeting arranged with the foster parents so that she could see the child; again this was followed by an unannounced visit. She expressed unhappiness with her job to her family counselor and mentioned she would prefer selling, perhaps cars or real estate, or working with animals. She thought of raising and selling Burmese kittens. An appointment was made for her to see a person who raised animals but she failed to keep the appointment. By the time of the hearing on the Home's petition, she had lost her job. Her father now said he was willing to allow the baby into the household. He had thought, however, that his daughter could not cope with a baby. The mother's plan as expressed at the hearing was to get a job and have her father or a babysitter care for the child.

On these facts, the judge concluded that the mother "took an unrealistic approach to her problems and never worked out a practical way to implement her plans for herself or the child." The judge therefore found that it was "in the best interest of . . . [the child]" to grant the petition to dispense with parental consent to adoption, so that the child could be adopted by the family the Home had selected, a young couple in their early thirties, eight years married, with another adopted child.[3]

In her attack on the application of the "best interests" test to her case, the mother points to the fact that the Home's custody of the child, the basis of the § 3 action,

---

[3] An investigation of the background of that family had furnished convincing evidence that they were suitable as adoptive parents.

The decree itself of course did not consummate the adoption., A fresh petition in the Probate Court for adoption under G. L. c. 210, § 1, remains necessary, see also § 5A (requiring report by Department of Public Welfare or adoption agency on child and adoptive parents), but the § 2 requirement for parental consent was eliminated by the proceedings here in question, thus making the petition for adoption a simple proceeding.

derived from her consent to temporary foster care, and argues that once she withdrew that consent and sought her child's return there was no basis for a § 3 action. She raises the possibility, if the "best interests" test were applied literally in cases of voluntary custody, that a family obliged by temporary adversity such as illness to place its child in foster care might then be deprived of the child against its will if the agency decided that another family could better raise the child. She argues that the Legislature could not so have intended to disregard the ties between the child and the natural parent, and that indeed it would be unconstitutional to do so. Hence she would have us conclude that § 3's "best interests" test can only be applied when the parent has already been deprived of custody of the child by court action, and that in cases where custody is based on voluntary surrender the consent of the parent may be dispensed with only on a showing of parental "unfitness" like that required to deprive a parent of custody under the guardianship statute, G. L. c. 201, § 5. She adds the complaint that she was not fully informed of the possible consequences when she gave consent to foster care and so she denies there was a "custody" to satisfy § 3. Finally, there are arguments that the § 3 "best interests" standard is unconstitutionally vague and that it violates the equal protection clause of the Constitution, in that it improperly discriminates against the poor, who are more likely to need foster care for their children.

While we find force in the mother's arguments, we believe they are based essentially on a misunderstanding of the relationship between the notions of "best interests of the child" and parental "unfitness." The mother perceives the two criteria or tests as separate and distinct, with each to be applied in certain clearly defined circumstances. We think that the relationship is more subtle, that elements of parental "unfitness" figure strongly in the "best interests" test, while elements of "best interests of the child" weigh in any consideration of whether a

parent is fit to have custody of his child. When the interconnection or overlap is appreciated, the mother's case on the present facts is seen to be unavailing.

To trace the development of the standards: Adoptions by consent of the parents were recognized in the Commonwealth at least by the time of St. 1851, c. 324, which described procedures for such adoptions. Promptly afterwards came St. 1853, c. 402, which created the first exception to the rule that adoption required the consent of living parents; it dispensed with consent where the parent was "insane." In 1859, by St. 1859, c. 61, consent was made unnecessary where the parent had "wilfully deserted and neglected to provide for the proper care and maintenance . . . for one year"; this was eventually codified as part of G. L. c. 210, § 3, which also specified other grounds for dispensing with parental consent, such as current imprisonment of the parent for more than three years.

Chapter 593, § 1, of the Acts of 1953, codified as G. L. c. 210, § 3A, first provided for an independent proceeding, prior to adoption proceedings proper, at which it could be determined whether parental consent was to be necessary for the adoption. Its purpose was to facilitate and expedite the process of adoption of children being held in temporary foster care. See the Department of Public Welfare recommendations, 1953 House Doc. No. 118, accompanying their draft bill, 1953 House Doc. No. 124. The proceeding could be brought by the Department of Public Welfare or any appropriate child care agency having custody of the child. But the act was silent as to the standards to be applied in deciding when consent could be dispensed with, and in *Consent to Adoption of a Minor*, 345 Mass. 706 (1963), this court held that, in the absence of any other indication in the statute, the conditions set out in § 3 for direct adoptions were still to be met; specifically, the court held that a finding of parental "unsuitability," without a finding of

wilful desertion or neglect for a year, was not an adequate basis for a decree dispensing with the parental consent.

The department had evidently not intended the § 3 conditions to be read into the independent § 3A proceeding. Therefore the department immediately sponsored St. 1964, c. 425, which provided that consent could be dispensed with "if the court finds that the best interests of the child will be served by placement for adoption"; the court was not to be restricted by the § 3 conditions, but was to give "due regard to the ability, capacity and fitness of the child's parents . . . and to the plans proposed by the department or other agency initiating such petition." This statute thus broadened the factors the court could consider in deciding whether to proceed over the parent's objections; unsuitability besides desertion or neglect was now clearly an available ground. In fact this was not a sharp or precipitate departure from the past, for our court had already begun a gradual process of developing a "best interests" approach to § 3 itself. [4]

The last step in the evolution of the adoption laws took

---

[4] For example, in *Adoption of a Minor*, 343 Mass. 292 (1961), an aunt who had had custody of a child since a week after birth petitioned to adopt the child despite the objections of the mother. Though the mother was worthy to be a parent, we said expressly that the successive amendments of § 3 disclosed "a clear intent on the part of the Legislature to relax the requirement of parental consent to adoption when the withholding of consent by a neglectful parent would frustrate the furtherance of the best interests of the child." *Id.* at 298. We accordingly took into account the bad effect on the child of breaking the bonds of affection between the aunt and the child, and approved the aunt's adoption of the child. See *Adoption of a Minor*, 357 Mass. 490, 492 (1970); *Adoption of a Minor*, 362 Mass. 882 (1972). See also *Adoption of a Minor*, 338 Mass. 635 (1959) (applying "best interests" test to dispute over whether consent to adoption was necessary by unmarried father of child who later married mother); *Erickson* v. *Raspperry*, 320 Mass. 333 (1946) (applying "best interests" test to decide whether consent to adoption could be revoked).

place in 1972 with the passage of St. 1972, c. 800.[5] The same basic standard was made to apply to direct proceedings for adoption as to the independent proceeding, and the two proceedings were both brought within § 3. To the factors "ability, capacity and fitness" was added "readiness . . . to assume parental responsibility," and a "presumption" was established that "the best interests of the child" would be served by dispensing with the need for parental consent when the child has been in the custody of the department or agency for more than one year (irrespective of incidental parental visits).[6] The revised § 3 in its entirety was made to apply only to petitions by those already having custody of the child.

It will be observed from this brief history that the explicit introduction of the "best interests" standard into the adoption statutes was occasioned by a judicial decision disallowing parental "unsuitability" as the ground for dispensing with consent to adoption. In writing the statute the department and the Legislature were concerned primarily with cases where unfit parents (although not within the categories of old § 3) were blocking the adoption of their children; we do not think they meant to allow fit parents to be deprived of their children, even if they had temporarily given up custody, unless some factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents indicated that the child would be hurt by being returned to the natural parents.

---

[5] This 1972 legislation was part of a larger program of reform developed by the Governor's Commission on Adoption and Foster Care which included the creation of an Office for Children. See the Governor's message of February 9, 1972, House Doc. No. 5131. Also to be consulted is Professor Gruber's influential later report to the Commission, Foster Home Care in Massachusetts (1973), as well as the Commission's report, Governor's Commission on Adoption and Foster Care, Report to Governor Sargent, March 14, 1973.

[6] The "presumption" was not relied on by the probate judge in her report in the present case and does not figure on this appeal.

Nor have we found any cases where fit parents who have voluntarily given up temporary custody for appropriate reasons lost their children to adoption by reference to the "best interests" standard simply because another set of parents was found better qualified.

We pass to the second part of our inquiry, a consideration of the law governing the transfer of custody of children under the guardianship law. By G. L. c. 201, § 1, the Probate Court may, "if it appears necessary or convenient" appoint guardians of minors; by § 5 (deriving from St. 1873, c. 367), the guardian may have custody of the child, though the parents are alive and do not consent, if the court finds the parents "unfit" to have custody.[7] In *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932), our court held that "the first and paramount duty of courts" in passing on custody cases under that law "is to consult the welfare of the child." Further, it recognized that "certain parents might be fit to bring up one child but unfit to bring up another." In *Stinson* v. *Meegan,* 318 Mass. 459, 463 (1945), we added that "the meaning of 'unfit' is not confined to the moral character or personal qualities of the parent," but "embraces other

---

[7] Alternatively, G. L. c. 119, § 23 (C), as appearing in St. 1970, c. 888, § 5, permits the Department of Public Welfare to "seek and . . . accept" on order of the Probate Court "responsibility" for minors "without proper guardianship due to the death, unavailability, incapacity or unfitness of the parent." Such responsibility may, if the court orders, include the right to consent to adoption. Sections 24-26 allow a Juvenile Court (or the juvenile session of a District Court where there is no Juvenile Court) if it finds after petition by "any person" that a child is "without necessary and proper physical, educational or moral care and discipline, or is growing up under conditions or circumstances damaging to a child's sound character development, or . . . lacks proper attention of parent . . . and whose parents . . . are unwilling, incompetent or unavailable to provide such care," to commit the child to the custody of the department or "make any other appropriate order with reference to the care and custody of the child as may conduce to his best interests, including but not limited to" leaving the child with its parents under supervision, or transferring temporary custody to a qualified individual, agency, or the Department of Public Welfare.

circumstances," particularly those that "involve the welfare of the child himself." The injection of considerations of the child's welfare here thus roughly paralleled that in the adoption situation.[8] Both *Richards* and *Stinson*, however, declined to find "unfitness" sufficient to deprive a parent of custody simply on the basis of a long separation of parent and child, and the growth of close ties between the child and the person seeking custody; the cases held that some negative findings with regard to the actual fitness of the natural parents to raise the child were necessary.

That the language of "best interests" in the cases under the guardianship statute was not rhetoric but had real significance, however, was demonstrated by *Wilkins* v. *Wilkins*, 324 Mass. 261 (1949), which weighed heavily the fact that the child loved its guardian and distrusted and had nightmares about its parents. These circumstances, together with the emotional shock to the child were it to be uprooted, and the lack of experience or aptitude of the natural parents in dealing with the child, persuaded the court that the best interests of the child would be served by granting custody to the guardian with whom the child was residing. Thus by 1970 we could write in *Kauch, petitioners*, 358 Mass. 327, 329 (1970), that "[n]early all the relevant cases have considered the best interests of the child in determining whether the parents are unfit."

Our result, therefore, is that the tests "best interests of the child" in the adoption statute and "unfitness of the parent" in the guardianship statute reflect different degrees of emphasis on the same factors, that the tests are not separate and distinct but cognate and connected.

It remains to tie the teachings of the historical development to the present case. In invoking the "best interests of the child" the Legislature did not intend to disregard the ties between the child and its natural

---

[8] See n. 4 above.

parent, or to threaten a satisfactory family with loss of children because by reason of temporary adversity they are placed in foster care.[9]  A parent cannot be deprived unless some affirmative reason is shown for doing so such as a finding of a serious problem with that parent, or of a separation so long as to permit very strong bonds to develop between the child and the prospective adoptive parents.  When such a reason appears, however, it can hardly be argued that the Legislature is powerless to interfere with the parent-child relationship to promote the welfare of the child.  Its power to do so — and this includes the power to act without perfect wisdom — was settled at least by the time of *Prince* v. *Massachusetts,* 321 U. S. 158 (1944) (State may prohibit parent's use of child to sell religious pamphlets).  See also *Commonwealth* v. *Brasher,* 359 Mass. 550 (1971) (State may try minors for crime of being "stubborn children").

As to the technical argument that once the mother withdrew her consent to custody there was no basis for a § 3 action, we note, first, that there is nothing in the statute to suggest that custody means anything other than physical custody, whatever the original basis for it.  If it be argued that this opens the way to adoptions over the objections of parents from whom custody is being wrongfully withheld, the response is that the present is not such a case.  The mother indeed now opposes the petition, but that in itself cannot amount to an effective withdrawal of consent to custody; if it were, most of the field of action of § 3 would disappear, since it would become inapplica-

---

[9] We are not drawn into the long standing debate among psychiatrists, psychologists, social workers, and lawyers about the precise limits of the claims of "biological" parents or about the precise values of "continuity" in the care of children.  For the current phase, see Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973), and reviews by Dembitz, 83 Yale L. J. 1304 (1974); Katkin, Bullington & Levine, 8 Law & Soc. Rev. 669 (1974); Rothman & Rothman, 1 The Civ. Lib. Rev. 110 (1974).  See also Mnookin, Foster Care — In Whose Best Interest? 43 Harv. Educ. Rev. 599 (1973).

ble except when the parent had already permanently lost custody by court action finding the parent unfit. Rather, if parental opposition to custody is by itself ever to constitute an effective bar to prosecution of a § 3 proceeding, a question we need not now decide, it must at least be consistently and vigorously pressed before the proceeding is brought. On the record before us, such opposition was not and cannot be found in the vacillating behavior of the mother over the ten-month period between the child's birth and the bringing of this petition, when added to her failure and indeed her inability to take positive action toward creating an environment in which a child could be placed with any substantial hope of future stability or happiness. [10] In the absence of such opposition, the "best interests" standard properly applied.

As to the claim of lack of comprehension on the mother's part of the possible legal consequences of placing her child in foster care, with possible resulting undermining of the basis of the § 3 proceeding, we of course agree that it is desirable to inform a parent of the full meaning of a decision to place a child in foster care, and,

---

[10] In *White* v. *Minter,* 330 F. Supp. 1194 (D. Mass. 1971), a three judge Federal court held that the G. L. c. 248, §§ 35-40, action by which a parent may seek to regain custody of a child was not adequate to protect a mother's rights. The G. L. c. 248 action amounts to a "habeas corpus" proceeding on behalf of a minor by its parent against those wrongfully holding the child. In the *White* case, the Department of Public Welfare had obtained custody on a voluntary basis during a temporary illness, and the mother had sought to regain the child as soon as she was able to, within three weeks of the placement, and had continued to seek its return. The department, however, neither returned the child nor instituted an action under G. L. c. 119, § 23 (see n. 7 above), letting six months pass. In the circumstances, which are far from those of the present case, the court ruled that the mother's rights had been violated. It held that the department must either return the child or bring suit for custody itself, finding the G. L. c. 248 action an inadequate remedy for the mother because under it, the court said, she had the "burden of proof." Cf. *Boyns* v. *Department of Pub. Welfare,* 360 Mass. 600 (1971). In *Stinson* v. *Meegan,* 318 Mass. 459, 462 (1945), we had held that the issue in a G. L. c. 248 action was exactly that in a

further, to explain the possible alternatives, including, for example, use of day care facilities. But if there was any shortcoming here, it was not critical. In our view, the basis of the decree dispensing with parental consent here was not simply the initial voluntary placement, but the failure, over a ten-month period, to take effective steps to demonstrate either a consistent desire for custody or an ability to care properly for the child if given custody. Had the mother, upon her initial change of heart in July, acted consistently in seeking to regain her child and planning effectively for it, we think she would and should have prevailed in any proceeding brought by the department to dispense with her consent to adoption, despite her signed agreement placing the child in temporary foster care, and regardless of the comparative qualifications of an alternative family. [11]

Our conclusion is that a § 3 proceeding was appropriate in this case, and the result correct. As we have suggested, the "best interests" standard of § 3 is a flexible one; the weight to be accorded the several considerations under it will vary with the circumstances. The decision

guardianship custody proceeding under G. L. c. 201, § 5: was the parent "unfit"? We think the basis of *White*, therefore, is less one of technical "burden of proof" than of imposition on the mother of the burden of instituting and prosecuting a lawsuit. In any event, *White* does not apply here. The mother here did not consistently seek the return of the child after she gave it up, and act toward that end. Moreover, it is likely here that the agency refrained from pressing any action against the mother in order to give her time to arrange her affairs and make plans to take the child back if she wished and was able to do so. It may well have felt that an earlier action would be premature because the mother had not yet demonstrated her unfitness, and because the child was still so young that the transfer back to its mother, if she were able and willing to assume responsibility, would not cause a profound shock to it. See 645-646 below.

[11] Compare the situation in *Adoption of a Minor*, 362 Mass. 842 (1973), in which the signed agreement was for adoption, and we held it therefore directly satisfied the G. L. c. 210, § 2, requirement of parental consent. Here no such consent was given, so a § 3 "best interests" inquiry was necessary in any event regardless of her consent to foster care.

in the present case was not an easy one. Here parent and child had been separated for only ten months when the proceeding was brought; this period was too short to be a decisive factor, particularly as the record does not state that the foster parents are also to be the adoptive parents.[12] We find most significant, however, the judge's conclusion that the mother "took an unrealistic approach to her problems and never worked out a practical way to implement her plans for herself or the child." The trial judge had the opportunity to observe the parties close up, and her findings are entitled to much respect. See *Guardianship of a Minor,* 1 Mass. App. Ct. 392 (1973).[13] In the circumstances we do not think the result would be any different had the analysis been conducted in the language of the "unfitness" standard, as the mother urges it should have been.

In reaching our conclusion to support the judge's finding we wish to point out with emphasis that we do not lend any approval to dispensing with parental consent for other than substantial reasons. The attitude to be taken by the department, the agencies, and the courts as well, was defined by the Legislature in G. L. c. 119, § 1, which declares it "to be the policy of this commonwealth to direct its efforts, first, to the strengthening and encouragement of family life for the protection and care of children; to assist and encourage the use by any family of all available resources to this end; and to provide substitute care of children only when the family itself or the

---

[12] We do note, however, that in many cases foster parents are now being sponsored as adoptive parents; especially if the foster care has been extended, the putative emotional shock to the child of transfer may be an important factor in the calculus.

[13] As we have a report of material facts with the evidence not reported, "[t]he facts found by the probate judge must be accepted as true. *Richards* v. *Forrest,* 278 Mass. 547, 551-552 [1932]. The sole question is 'whether the findings of the judge "should in law require a decree different from that which was entered in the . . . [court below]."' *Cosgrove* v. *Cosgrove,* 351 Mass. 64, 66 [1966]." *Kauch, petitioners,* 358 Mass. 327, 328 (1970).

resources available to the family are unable to provide the necessary care and protection." Thus parents should be given ample opportunity to demonstrate an ability to provide proper care for their children before a § 3 proceeding is brought. Precipitate attempts to force adoption over parental objection simply because foster care has occurred are not consistent with the law and must be avoided. It is a condition of dispensing with parental consent that the parents be shown to have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard.

On the constitutional plane, we see no merit in the argument that the "best interests" standard is overly vague. Section 3 itself sets out factors to be taken into account in deciding if the standard is met. Moreover, as we have indicated in this opinion, the course of the legislative development of the standard and the associated case law provide further definition. Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment. Underlying each case are predictions as to the possible future development of a child, and these are beyond truly accurate forecast. In similar situations statutes with unavoidable penumbras of indefiniteness have been upheld, and we think this one, too, is valid. See *Commonwealth* v. *Brasher,* 359 Mass. 550 (1974) ("stubborn child"); *A Juvenile, petitioner,* 364 Mass. 531 (1974) (statute allowing trial of juvenile if "the interests of the public" require it); *Guardianship of a Minor,* 1 Mass. App. Ct. 392 (1973) ("unfitness" in guardianship custody statute).

Nor do we find a violation of the equal protection clause. If the argument be made that under § 3 State interposition in the parent-child relationship will occur more frequently in poor families than in wealthy ones, we can say no more than that the statute's classification is not directly based on wealth, and a differential effect in practice on families with varying incomes occurs also

with many valid laws. The overriding constitutional basis for the law is the State's interest in protecting those children found on a reasonable basis to be in need of adoption.

*Decree affirmed.*

HENNESSEY, J. (dissenting). Like most contested cases concerned with the custody of young children, this case calls for Solomonic wisdom. The probate judge, and the Justices of this court who joined in the main opinion, obviously appreciate this requirement, as shown by their exhaustive attention to factual details. The resulting analysis of the majority would be persuasive to me if I believed that this child was in "the care or custody" of the Home, for purposes of G. L. c. 210, § 3. As the majority rightfully conclude, the "best interests" standard is, under § 3, determinative of whether parental consent to an adoption is required. See 1964 Ann. Surv. of Mass. Law, § 8.3. See also *Consent to Adoption of a Minor,* 363 Mass. 537, 546-547 (1973). However, before that section comes into play it must be shown that the child is within the care or custody of the child care agency.

This finding is important because unless the child is found to be in the care or custody of the agency for purposes of § 3 the standard to be applied under the prevailing law is parental unfitness. The majority opinion equates best interests under § 3 with unfitness and thus assumes that the parent suffers no adverse effect by being held subject to the best interests standard with respect to the need for her parental consent to an involuntary adoption. I disagree.[1]

---

[1] I do, however, agree with the majority opinion in so far as it suggests that unfitness is apparently an emerging concept and that it is unlikely that a finding of unfitness would today be exclusively limited to the special requirements of the earlier statutory and common law such as repeated drunkenness, prostitution, insanity, or desertion. Nevertheless, the definition of unfitness, although in flux, is not the equivalent of best interests; unfitness is a concept which, in

The majority opinion draws support for its interpretation of best interests from cases decided under predecessor statutes to § 3 (see, e.g., *Beloin* v. *Bullett*, 310 Mass. 206 [1941]; *Adoption of a Minor*, 357 Mass. 490 [1970]; *Adoption of a Minor*, 362 Mass. 882 [1972]) and cases decided in the guardianship context under c. 201, § 5 (see, e.g., *Richards* v. *Forrest*, 278 Mass. 547 [1932]; *Stinson* v. *Meegan*, 318 Mass. 459 [1945]; *Kauch, petitioners*, 358 Mass. 327 [1970]). However, my review of the cases decided under these predecessor statutes, specifying instances where consent to adoption was not required, indicates a qualitative difference in defining the burden of proof to be met under an "unfitness" as opposed to a "best interests" test. I note that these cases decided under the "unfitness" test appear to have borne results which under a governing best interests test would likely have been different. It seems that the conduct of the natural parents described in the cases cited above was definitely more egregious than that of the instant parent, yet the natural parents in several of those cases were rewarded with custody of a child they had given up for years. See, e.g., *Richards* v. *Forrest, supra*; *Stinson* v. *Meegan, supra*.

Under a best interests test the rights of the parent are likely to be heavily subordinated to those of the child while under an unfitness test the focus of inquiry is more on the conduct and character of the parent as it affects the child, although, of course, unfitness involves the interests of the child. Not uncommonly as stated in *Richards* v. *Forrest, supra*, at 552 "the word . . . [unfitness] imports something of moral delinquency." So also egregious faults in parental character might rise to the level of unfitness.

Application of the best interests standard in cases where the child has been shown to be within the care or custody

the absence of care or custody in the child care agency within the meaning of § 3, should be reckoned with in terms of a parent's right to be with his or her child.

of the child care agency accords with the legislative intent underlying the best interests amendment to § 3A, because that amendment was designed to facilitate adoption proceedings where a child had been left relatively permanently in the care or custody of an agency.[2] To that end the amendment served to prevent parents who had definitely given up their children to the care or custody of said agencies from blocking subsequent adoption proceedings. See Annual Report of the Commissioner of Public Welfare, 1964 House Docs. Nos. 64 and 69. See generally *Consent to Adoption of a Minor*, 363 Mass. 537, 546-547 (1973).

However, to apply that standard in this case without more regard for parental rights is in my opinion improper because, in circumstances such as we have in this case, the requisite giving up of the child to the care or custody of the agency has not been established. The passage of only ten months' time, during which time the parent apparently paid weekly amounts in support of the child, appears to me to be the nub of the case. In that short span, a custody, which can only be said in fairness to be a temporary one voluntarily conferred by the mother, has ripened into a foreclosing of the mother's rights. Although her economic plans may have been somewhat eccentric and although, under what must have been intense pressures, she vacillated in her resolve to keep her child, the conduct of this mother is certainly not the equivalent of wilful neglect or unfitness generally. In my view, the case would be more clearly proved with the passage of more time. Foster care could be continued for

---

[2] The majority state that "there is nothing in the statute to suggest that custody means anything other than physical custody, whatever the original basis for it." I do not agree. Although not controlling, it is interesting to note that custody in a charitable institution under former § 3 was established if inter alia the parent "has suffered such child to be supported for more than one year continuously prior to the petition [for adoption] by an incorporated charitable institution."

a further period. There is no suggestion here that the child has been with the persons who hope to adopt the child, and so the problem will not be exacerbated by the passage of further time pending a final resolution.

It occurs to me that this parent would most likely not have "lost" her child had she not temporarily placed the child in the New England Home while she attempted to settle her life, an act which in her judgment was best for the child. Yet that is the result reached by the decision rendered in this case. To extend the best interests standard to these facts would in my opinion go further than the Legislature intended. As this case indicates, the best interests standard may bring to the fore considerations different in kind and degree from unfitness, considerations perhaps decisive as to whether the parent will lose his or her right to protest the taking away of a child through an involuntary adoption.

Since I perceive the best interests standard to be less protective of parental rights and since I do not see this child as having been shown to be within the care or custody of the Home, I would deny the petition to dispense with parental consent to the adoption unless the parent had been shown unfit, a finding not supported by the facts as reported.

It may be that the best interests standard should apply across the board to all cases involving the custody of children, yet that is in my view a more substantial step than the Legislature accomplished by the addition of best interests to § 3. Hence I would give the mother's rights in this case more weight than accorded them under the best interests standard. [3]

---

[3] My resolution of the questions in this case means that I need not address the constitutional issues. However, I point out that where the State intrudes into matters affecting the heart of family relationships fundamental rights may be implicated. See, e.g., *Meyer* v. *Nebraska*, 262 U. S. 390, 399-403 (1923); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534-535 (1925); *Stanley* v. *Illinois*, 405 U. S. 645, 658-659 (1972); *Wisconsin* v. *Yoder*, 406 U. S. 205, 234-236 (1972).

I think that, although the case is a close and troublesome one and there is reason to believe that the child may have a more secure future if adopted, it nevertheless in my view is one of those which the main opinion warns of, viz., "[p]recipitate attempts to force adoption over parental objection simply because foster care has occurred."