JEANETTE MARY CENNAMI & another *vs.* DEPARTMENT OF
PUBLIC WELFARE.

Suffolk.    February 15, 1977. — June 10, 1977.

Present: HALE, C.J., GOODMAN, & ARMSTRONG, JJ.

*Minor,* Custody.   *Parent and Child,* Foster parent.   *Practice, Civil,*
Custody proceeding.   *Due Process of Law,* Right to hearing.

A single justice of this court properly dismissed an action for declara-
tory relief under G. L. c. 231A, § 3, where the matters sought to be
litigated were already the subject of litigation, including a child cus-
tody proceeding and a guardianship proceeding, pending in other
courts; on appeal, however, a panel of Justices of this court vacated
the judgment of dismissal in order to permit the single justice to
retain jurisdiction and make any further orders necessary for expe-
diting the other proceedings.  [407-408]

A family's substitute parental relationship to a child, following the
child's temporary placement with the family by the Department of
Public Welfare pursuant to G. L. ·c. 119, § 23(E), and the depart-
ment's acquiescence in the family's continuing physical custody after
the department won the right to custody through Probate Court
proceedings, was, in the circumstances, neither unlawful nor im-
proper [408-413]; the child's legally protected interest in the sub-
stitute parental relationship required that the family be made
parties defendant in a custody proceeding by the department pur-
suant to G. L. c. 119, § 23(C)  [413-415].

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on September 23, 1976.

On transfer to the Appeals Court, the action was heard
by *Grant, J.*

*David D. Kerman* (*Jacoba W. Shulman* with him) for
the plaintiffs.

*James C. Doyle, Jr.,* for the defendant.

ARMSTRONG, J.    This is an appeal from a decision of a
single justice of this court which dismissed an action
brought originally in the Supreme Judicial Court and
transferred to this court for disposition under G. L. c. 211,

§ 4A. The action is one of several presently pending in various courts each concerning the custody of a female child born on April 24, 1975. The child's mother left her with a relative shortly after birth. About four weeks later, the child, in circumstances not disclosed by the record before us, came to live with the Cennami family, where she remains to this day. All parties assume for purposes of this proceeding that the child has been abandoned by her mother, if not in the criminal sense (see G. L. c. 119, § 39, and *Stinson* v. *Meegan*, 318 Mass. 459, 464-465 [1945]), at least in a sense that would justify a finding of parental unfitness under G. L. c. 201, § 5 (see *Prindle* v. *Fisk*, 2 Mass. App. Ct. 348 [1974]), or a judgment dispensing with the mother's consent to adoption (see G. L. c. 210, § 3, and *Petition of the New England Home for Little Wanderers*, 367 Mass. 631, 638-639, 644 [1975]).

On January 19, 1976, Mrs. Cennami reported to the defendant (department) that she had been caring for the child. The department considers itself as having taken the child into its care under the provisions of G. L. c. 119, § 23 (E),[1] on March 4, 1976. On April 6, 1976, the department filed a petition in the Probate Court for Essex County seeking custody of the child under the provisions of § 23 (C).[2] The Probate Court the same day entered a temporary order giving custody to the department. No prior notice of that proceeding was given to the Cennamis; but on April 8, 1976, a social worker informed Mrs. Cennami by letter of the order and advised her that the child's mother, if she should appear, should not be permitted to visit the

---

[1] "E. [as amended by St. 1975, c. 276, § 2] Any child under eighteen years who is left in any place and who is seemingly without a parent or legal guardian available shall be immediately reported to the department, which shall proceed to arrange care for such child temporarily . . .."

[2] "C. [as amended by St. 1973, c. 925, § 40] The department may seek and shall accept on order of a probate court the responsibility for any child under eighteen years of age who is without proper guardianship due to the . . . unavailability . . . of the parent or guardian . . .. Such responsibility shall include the right to determine the child's place of abode . . .."

child or take her away but should be told to contact the social worker.

On May 3, 1976, the social worker filed with the department a report in which she recommended that the Cennamis be approved as foster parents, subject to the reservation that "they may have trouble with [the] separation issue if it becomes possible for ... [the child] to return home." Sometime thereafter a "child welfare specialist" assigned to investigate the Cennamis' backgrounds and manner of living filed a lengthy report in which she recommended, not without some reservations, that the Cennamis be approved as "special" foster parents "for [this child] only." On June 18, 1976, a social services supervisor, apparently on the sole basis of the written reports, and after consultation with an associate regional administrator, disapproved the Cennami home as a special foster home, recording at some length his reasons for the decision. We think that no purpose is to be served by recounting the reasons given for the two positive recommendations and the ultimate negative decision, other than to mention that the evident thoroughness and sensitivity with which the persons involved approached a difficult decision reflect credit on the department.

The Cennamis were informed of the decision of the department by a letter dated July 8, 1976. Within a week their counsel had contacted the department and sought a hearing under G. L. c. 18, § 16. On July 19, 1976, the social services supervisor met with the Cennamis' counsel (he apparently refused to meet with the Cennamis), but the meeting "made no progress in resolving [the] matter." The department then filed a motion in the Probate Court (Essex) for an order that the Cennamis turn the child physically over to the department in accordance with the temporary custody order of April 6, 1976. Notice of the motion was sent to the Cennamis on July 21, 1976, but service of process was not made upon them. On July 23, 1976, the Cennamis filed in the same court petitions for guardianship and for adoption. On July 26, 1976, the department's custoday action came on for hearing on the department's mo-

tion for physical delivery of the child. The Cennamis filed motions for the appointment of a stenographer, for appointment of a guardian ad litem to represent the child, and for dissolution of the temporary custody order. The judge, taking no action on any of the various motions, directed the court's probation department to conduct an investigation. The product of that investigation is not before us; but on August 23, 1976, the probate judge denied the Cennamis' motion for dissolution of the temporary custody order. He took no formal action on the other motions, taking the view, according to the Cennamis' brief,[3] that the Cennamis had no standing in the department's custody action and that allowance of the department's motion for physical delivery was superfluous since the effect of the temporary custody order of April 6, 1976, was to place the Cennamis under a present obligation to deliver up the child.

On September 14, 1976, the Cennamis, still not having delivered the child to the department, filed a motion in the department's custody action for a modification of the temporary custody order which would have the effect of giving the department "legal custody" of the child and the Cennamis "physical custody" of the child pending a hearing on the Cennamis' petition for adoption and completion of a "Family Services Investigation." Ancillary motions for appointment of a stenographer and a guardian ad litem were also filed. So far as we are told no action has been taken on any of those motions. Meantime, on September 7, 1976, the department accorded the Cennamis a hearing under the provisions of G. L. c. 18, § 16, but no decision was rendered on that date.[4]

It was with matters in that posture that the Cennamis, on September 23, 1976, filed in the Supreme Judicial Court

---

[3] We regret the fact that this court has not had the benefit of a brief on behalf of the department.

[4] On September 30, 1976, the department rendered a decision holding that G. L. c. 18, § 16, was not available to persons in the Cennamis' situation. The Cennamis appealed that decision to the Superior Court under the provisions of G. L. c. 30A, § 14.

a complaint initiating the action which is before us on appeal. It recounted much of the above history and sought: (1) interlocutory and permanent orders enjoining the department from disturbing the Cennamis' physical custody of the child; (2) transfer from the Probate Court to the Supreme Judicial Court of the department's custody proceeding, the Cennamis' guardianship proceeding, and the Cennamis' adoption proceeding; (3) a determination that the temporary custody order is not binding on the Cennamis; (4) a declaration that the child is entitled as of right to the appointment of a guardian ad litem; (5) a declaration that the Cennamis' physical custody of the child should not be disturbed by the department prior to an evidentiary hearing "wherein it is determined and adjudged that such [a] disruptive change of the status quo is necessary to protect ... the child ... from irreparable harm"; and (6) a declaration that the present living arrangement may not be disturbed absent "a showing of compelling countervailing circumstances." A single justice of the Supreme Judicial Court entered an order staying the custody order of April 6 and transferring the case to this court. After hearing, a single justice of this court denied all prayers for relief, finding that the matters raised in the principal prayers for relief had been fully argued in the Probate Court at the hearing on the motion to dissolve the custody order and that no appeal had been taken from that decision; that the present complaint was not a proper vehicle for attacking the department's action in the G. L. c. 18, § 16, hearing (which was then the subject of an appeal pending in the Superior Court [see note 4, supra]); and that he was unable to find that the probate judge had based his decision in the department's custody action on a standard other than the best interest of the child. The single justice found no reason to transfer to this court the several proceedings pending in the Probate Court. He also continued in effect pending appeal the stay of the transfer of the child from the Cennamis' care.

There is no question in our minds that the judgment entered by the single justice properly adjudicated the legal

rights of the Cennamis in the case as it stood before the single justice. Whatever discretion the single justice may have had under G. L. c. 231A, § 3, the matters sought to be litigated were already the subject of litigation before other courts. It seems too obvious to require citation that one who is prosecuting in one court an appeal under the administrative procedure act may not of right circumvent that appeal by filing a separate proceeding for declaratory relief in another court. Compare *Selectmen of Truro* v. *Outdoor Advertising Bd.* 346 Mass. 754, 758-759 (1964). And assuming, without deciding, that an order awarding custody of a child to another, although stated to be temporary, is immediately appealable by an aggrieved party under G. L. c. 215, § 9 (cf. *Vincent* v. *Plecker,* 319 Mass. 560, 564, n.2 [1946]), that appeal, coupled with relief available under that section during the pendency of the appeal, would in the usual case fully protect the rights of the appealing party. Alternatively, relief pending an appeal from the eventual final decree is available under G. L. c. 215, § 24. In any event, there was no abuse of discretion on the part of the single justice in declining to permit the Cennamis to relitigate in a new proceeding in this court matters which were already the subject of litigation in other courts. For those reasons the judgment entered by the single justice would simply be affirmed if it were not for certain unusual circumstances which make desirable a retention of jurisdiction in order to expedite the disposition of proceedings not now before this court.

The problem is that a simple affirmance at this time would result in an immediate removal of the child from the care of the Cennamis pursuant to the temporary order at a time when it appears that the underlying questions surrounding the upbringing of the child have not only not yet been finally resolved but are the subject of five separate lawsuits which are pending in three different courts and which could result in conflicting decisions. In any proceeding involving the custody of a child concerns of res judicata must inevitably give way to an overriding concern for the welfare of the child. See *Purinton* v. *Jamrock,* 195 Mass.

187, 199 (1907); *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932); *Petition of the New England Home for Little Wanderers,* 367 Mass. at 640. Therefore circumstances may arise, and may have arisen in this case, where as a matter of the reasonable exercise of judicial power a temporary order transferring custody should not be entered while the issues of permanent legal custody, guardianship, or adoption by someone presently caring for the child remain unresolved. See *Stinson* v. *Meegan,* 318 Mass. at 462. See also *Adoption of a Minor,* 338 Mass. 635, 643 (1959). Compare *Custody of a Minor,* 2 Mass. App. Ct. 68 (1974).

Another factor dictating that course, one that may well have changed materially since the case was heard by the single justice, is that the temporary custody order is the result of a decision made by the department nearly a year ago and approved by the Probate Court almost ten months ago. No longer is it a fresh decision, as it was when the single justice considered the case; and the duration of the Cennamis' custody as it bears on "the putative emotional shock to the child of transfer may be an important factor in the calcul[ation]" of the best interests of the child. *Petition of the New England Home for Little Wanderers,* 367 Mass. at 645, n.12. For that reason as well, we think that the department and the Probate Court should be given an opportunity to review the present advisability of implementing their earlier decisions in connection with their consideration of the further matters which we shall proceed to discuss in an effort to expedite final disposition of this sensitive problem.

The controversy which lies at the heart of this case concerns the issue whether a hearing is required by law before the child may be removed from the physical custody of the Cennamis; and, if so, what type of hearing, with what parties, before what forum, and concerning what issues? It is clear that, apart from statutory requirements (see, e.g., G. L. c. 119, §§ 24-27, §§ 39E-39G, § 51B; c. 201, § 5), it is a requirement of fundamental due process of law that before a child may be removed from the custody of its natural parents, a hearing must be afforded. *Stanley* v. *Illinois,*

405 U. S. 645 (1972). A Federal District Court has recently reached the same result in a case involving removal of a child from the child's foster parents. See *Organization of Foster Families for Equality & Reform* v. *Dumpson*, 418 F. Supp. 277 (1976).[5] The Cennamis argue that they stand in loco parentis and that, on the authority of the *Stanley* and *Dumpson* cases, they are entitled as matter of Federal constitutional right to a hearing on the question whether the best interests of the child require that she be left in their care.

If the Cennamis are entitled to such a hearing, we are inclined to agree with the hearing examiner in the department that it is not the hearing provided by G. L. c. 18, § 16. That section provides for a hearing before the department terminates aid to a recipient under a program of aid administered by the department. Foster parents cannot be considered recipients of aid in the sense intended; rather, they contract with the department to provide a service to children whom the department has placed in their care, with the department agreeing to compensate the foster parents in some manner for the expenditures attendant in raising the children. That compensation cannot be considered a program of aid for the benefit of the foster parents. And, in any event, in the present case there is no suggestion in the record that the Cennamis were ever paid compensation by the department under its foster parent program. Given that the department refused formally to approve the Cennamis as foster parents, we can assume that the contrary is true. Moreover, we are informed that the department has adopted regulations, effective September 9, 1976, providing for hearing and review within the department of certain decisions involving removal of a child from a foster home. See Massachusetts Social Services Policy Manual, Part 249, Subpart C. We assume that the department would not

---

[5] The three-judge Federal District Court was divided. Probable jurisdiction was noted by the United States Supreme Court, sub nom. *Gandy* v. *Organization of Foster Families for Equality & Reform*, 429 U. S. 883 (1976), and the case was argued on March 21, 1977. 45 U.S.L.W. 3650 (March 29, 1977).

recognize the Cennamis as having standing as foster parents within those regulations.

Returning to the more fundamental question whether a hearing must be accorded the Cennamis before the child may be taken from their care, we think that the answer must be "Yes." We recognize that the recently enacted statutory scheme relative to children in need (see G. L. c. 28A) prohibits private or informal foster or adoptive placements[6] and that "common law" foster or adoptive parents in most cases will not only be held to have no legal standing, but indeed to stand in an untenable, unlawful relation to the child. There is nothing in the record in this case, however, which establishes that the Cennamis have been acting in violation of law in relation to the child. The record does not indicate that the Cennamis received the child for adoption or even for the purpose of providing "substitute parental care" within the meaning of G. L. c. 28A, § 9 (see note 6, *supra*) — a term which obviously is not intended to include babysitting arrangements. The factor which led to the development of a substitute parental relationship — the mother's failure to return — was duly reported by the Cennamis to the department in accordance with the requirement of G. L. c. 119, § 23 (E) (see note 1, *supra*) ; and the temporary care which the department arranged thereunder for the child was her continued care by the Cennamis. Even after the department sought and won the right to custody from the Probate Court, it acquiesced in the child's continued physical custody by the Cennamis for

---

[6] See G. L. c. 28A, § 11(*b*) (as appearing in St. 1974, c. 682, § 3): "No person shall maintain a child in family foster care without placement, supervision and approval by a placement agency unless such person is licensed by the office [for children]." The words "family foster care" are defined in § 9 (as amended through St. 1975, c. 125) as "substitute parental care in a family given in a private residence for up to six children under sixteen years of age on a regular, twenty-four-hour-a-day, residential basis by anyone other than a relative by blood or marriage." See also § 11(*c*) (as appearing in St. 1975, c. 858, § 4), which states in part: "No person unrelated to ... a child by blood or marriage ... shall receive such a child for purposes of adoption, except from a licensed or approved placement agency." Section 15 provides criminal penalties for persons who violate § 11.

several more months. When it sought to remove the child, the Cennamis secured court orders sanctioning their continued custody pending the outcome of the litigation. Thus, the Cennamis' custody of the child has not been one of mere naked possession, forbidden by law. Rather, their substitute parental relationship to the child, which has spanned virtually the entire two-year life of the child, has been and continues to be neither unlawful nor improper.

This relationship is one which has been recognized and protected in our law, even as against the rights of the child's natural parents. For example, in *Commonwealth* v. *Ball,* 259 Mass. 148 (1927), parents who several years earlier had been adjudged guilty of neglect, and whose children had been committed to the care of substitute parents, years later sought termination of the order of commitment, and sought a ruling that if it were found that the causes of their earlier neglectfulness no longer existed and that there was no probability of their being neglectful thereafter, they were entitled to return of the children to their custody. But the court held, at 151, that "[e]ven if the cause stated for the original commitment no longer exists and the parents are now competent and fit to have the care of the child, the court may, in the exercise of a wise discretion and upon an impartial determination of the facts in a particular case, decide that the welfare of the child will not permit her removal from her present custody." In cases involving child custody, "[t]he first and paramount duty is to consult the welfare of the child." *Purinton* v. *Jamrock,* 195 Mass. at 199. *Richards* v. *Forrest,* 278 Mass. at 553. *Gally, petitioner,* 329 Mass. 143, 147 (1952). *Petition of the New England Home for Little Wanderers,* 367 Mass. at 640-644. The *Purinton* case, at 199-201, held that the duty of determining custody cases in accordance with that standard is a legal right of the child, said to be correlative to the child's duty of allegiance to the government. And in that case, the decisive factors in the determination of the welfare of the child were that "the child had been for over four years in the family of the petitioners [for adoption]; they were found to be suitable persons to have her custody and edu-

cation; a strong affection had grown up between her and them...." *Id.* at 200. Compare *Adoption of a Minor,* 338 Mass. at 643; *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 371 Mass. 651, 657 (1976). We mention these factors, not as they bear on what is in fact best for the welfare of the child in the present case, but to illustrate that the interest of the child in the continuation of a custody of sufficient duration to amount to a substitute parental relationship is recognized by our law to be a legally protected right.

It may well be that, as the Cennamis argue, and as was held in *Organization of Foster Families for Equality & Reform* v. *Dumpson, supra,* due process forbids destruction of that relationship by government action without a hearing. See also *Britt* v. *Allred,* 199 Miss. 786 (1946). For purposes of the present case we need not rule on the point, because, unlike the court in the *Dumpson* case, we are not dealing with a statutory scheme and an agency contract that purport to preclude a hearing. Unlike that case and the *Britt* case, the statutes which bear on the present case call for a hearing. Recent amendments to the law, by forbidding private placements, have given the department an increasingly dominant role in arranging placements of children in need, but the statutory scheme has still not gone so far as to make the department's right to custody automatic. General Laws c. 119, § 23 (C), still requires the department to seek an order of custody from the Probate Court where custody is not voluntarily given; and there is nothing in the flood of recent legislation in this area[7] which indicates an intent to overturn the long standing principle of our law that an order transferring custody of a child, especially to one other than a natural parent, should be given only where the child's welfare so dictates.

The department's custody proceeding, therefore, has a

---

[7] See, e.g., St. 1970, c. 216; St. 1970, c. 404; St. 1970, c. 825; St. 1970, c. 888; St. 1972, c. 785; St. 1972, c. 800; St. 1973, c. 433; St. 1973, c. 1073; St. 1974, c. 397; St. 1974, c. 682; St. 1974, c. 845; St. 1975, c. 125; St. 1975, c. 579; St. 1975, c. 858.

dual aspect. As it concerns the child's natural mother, she is properly a party defendant, and the department's case turns on a showing of her unavailability or unfitness. G. L. c. 119, § 23(C). Compare G. L. c. 201, § 5; c. 119, § 24; c. 210, § 3(*c*). As it concerns the Cennamis and their substitute parental relationship to the child, the Cennamis should be made parties defendant, and the case turns on a showing that the welfare of the child will be enhanced by transferring custody of the child from the Cennamis to the department. We know of no authority for the Cennamis' contention that their custody is favored with an artificial presumption necessitating a showing of "irreparable harm" or "compelling countervailing circumstances."

At the time the temporary custody order was entered on April 6, 1976, the Cennamis were not parties to the department's custody action and had no knowledge of that proceeding. Without benefit of a formal motion to intervene, they appear to have filed motions in that proceeding at a considerably later date, and one of those motions (the motion for dissolution of the temporary custody order) was in fact acted upon by the court.[8] In a sense, therefore, the Cennamis may have become at some point de facto parties to the proceeding who could raise the points now argued by way of direct appeal. But the fact remains that the temporary custody order, whether or not final for purposes of appeal, is by definition not a final determination of the issues by the Probate Court; and the points the Cennamis seek to raise may still be raised in the custody action.

---

[8] Perhaps in ruling on that motion, the judge made a factual determination that the welfare of the child required a transfer of custody from the Cennamis to the department, but there are indications in the record (e.g., the implied denial of the Cennamis' motion for appointment of a stenographer) that the judge may have taken the view that the Cennamis have no legal standing in the matter and that the department was entitled to custody as matter of law on a showing of the natural mother's unavailability, desertion or unfitness. In any event the order was temporary only; and we are of the view that, where a strong substitute parental relationship has developed between a child and its present custodian, it is normally not good practice, absent emergency, to transfer physical custody of the child pending a final determination on the question of leaving that custody where it is.

Moreover, precisely the same question of the welfare of the child is, with other matters, at issue in the Cennamis' guardianship action now pending in the same court. See G. L. c. 201, § 5. We think that the indicated course of action is for the Probate Court to proceed as soon as may be to a consolidated hearing on the merits of the two actions[9] (compare *Custody of a Minor,* 2 Mass. App. Ct. 68 [1974]) and to render a final decision on the pivotal question of the welfare of the child as between the department and the Cennamis, supported, as a judgment should normally be, by findings for purposes of any appellate review which may then be sought. Mass.R.Dom.Rel.P. 52 (a) (1975). The Cennamis' motion for appointment of a stenographer should, of course, be granted.

A final point on the conduct of that proceeding is in order. On the facts of this case as they appear in the present record, the appointment of a guardian ad litem to represent the interests of the child is not required as matter of law. Neither the Cennamis nor the department purport to be representing anything other than the best interests of the child. The dispute to be resolved is whether it better serves the welfare of the child to preserve continuity of the substitute parental relationship which she has known all her life or to entrust this (so far as appears) highly adoptable child to foster and adoptive placements consciously selected to give her the best of advantages during her formative years. The Cennamis (whose rights, unlike those of a natural parent, are probably only derivative in any event[10]) vigorously represent the former view; the department, the latter. The child is, of course, too young to have any view of her own. In these circumstances we leave the appoint-

[9] Whether the Cennamis' adoption proceeding should be tried at the same time is clearly a matter of discretion for the Probate Court. Obviously a determination adverse to the Cennamis in the other two proceedings would appear to foredoom their hopes for adoption.

[10] The authors of both the majority and dissenting opinions in the *Dumpson* case appear to have regarded foster parents as without personal rights other than statutory in a continuation of the foster relationship. We do not have to reach the question in this case.

ment of a guardian ad litem to the discretion of the probate judge.

The judgment is vacated in order to continue in effect the stay entered by the single justice of this court on December 9, 1976, and to enable the single justice to retain jurisdiction to make such further orders as may in his discretion be necessary to facilitate early disposition by the Probate Court for Essex County of the department's custody proceeding (No. D-675) and the Cennamis' guardianship proceeding (No. 334726) and to expedite any appeal which may be taken from that disposition. Costs of appeal are to be in the discretion of the single justice.

*So ordered.*