## IN THE MATTER OF MARK RIPLEY CARSON.

Plymouth.    October 17, 1977. — November 16, 1978.

Present: KEVILLE, ARMSTRONG, & BROWN, JJ.

*Adoption. Parent and Child,* Adoption. *Constitutional Law,* Parent and child.

Upon review of the record of a proceeding on a petition to dispense with consent to adoption under G. L. c. 210, § 3, there appeared no error in the judge's determination that the best interests of the child would not be served by allowing the petition. [667–669] BROWN, J., dissenting.

There was no abuse of discretion in the denial of a motion, which was brought twenty-seven days after the entry of a judgment dismissing a petition to dispense with consent to adoption, by an attorney to intervene on behalf of the child. [669–670]

PETITION filed in the Probate Court for the county of Plymouth on October 2, 1973.

The case was heard by *Murphy,* J.

*Stephen R. Wainwright* for the petitioners.

*Richard C. Driscoll, Jr.,* for Mark Ripley Carson, intervener.

*David Berman* for Raymond A. Yorke, intervener.

KEVILLE, J. This is an appeal from a probate judge's "dismissal" of a petition brought under the provisions of G. L. c. 210, § 3 (*a*)(ii) and (*c*), as appearing in St. 1972, c. 800, § 2, by Pamela Ansaldi (Pamela) and her third husband Richard J. Ansaldi (Ansaldi), for the adoption and change of name of Pamela's three-year-old son, Mark, now age eight, by her first husband Raymond A. Yorke (Yorke), who intervened in opposition to the allowance of the petition. The petition alleged that Frederick W. Carson, Pamela's second husband, was the child's father.

This is Pamela's second appeal to this court from judg-
ments entered against her in a Probate Court in further-
ance of her quest to exclude Yorke permanently from any
form of association with their son Mark. Pamela's first
appeal which she lost, was from an adjudication of con-
tempt for her refusal to permit Yorke to exercise visita-
tion rights with Mark. Those rights had been granted to
Yorke in a divorce decree entered on a libel brought by
Yorke in the Probate Court for the county of Norfolk. See
*Yorke* v. *Yorke*, 2 Mass. App. Ct. 234 (1974). The same
decree awarded custody of the child to Pamela.

Mark was conceived at a time when Pamela was con-
sorting with both Yorke and Carson. She married Yorke
on July 18, 1969, in Massachusetts. She left him in Sep-
tember. Mark was born on March 5, 1970, in Nevada. On
his birth certificate, Mark was named Mark Ripley Car-
son. In the meanwhile Yorke, as stated, had brought a
libel for divorce against Pamela. On December 12, 1969,
Pamela had been granted an ex parte divorce from Yorke
in Nevada and on January 10, 1970, had married Carson
in that State. They were divorced in December, 1970.

Pamela returned in Massachusetts in May, 1970, and
in July Yorke's motion to amend his libel was allowed to
include Mark as a child born of Yorke's marriage to
Pamela. Yorke was granted a decree of divorce nisi from
Pamela which became final in January, 1971. Pamela did
not appear in those proceedings.

In September, 1970, Yorke brought a petition for con-
tempt against Pamela for her refusal to allow him to visit
the child. The petition was dismissed by agreement and
he continued to exercise his visitation rights until Decem-
ber, 1971, when Pamela again refused to permit him to
see the child. In October, 1972, Pamela married Ansaldi.
Yorke brought a second petition for contempt against
Pamela; and in May, 1974, this court sustained a Probate
Court decree on that petition which adjudged her to be in
contempt for refusing to allow Yorke to visit the child.
*Yorke* v. *Yorke*, *supra*. The present petition for adoption

had been filed on October 21, 1973, but no notice was given to Yorke until after the decree on the contempt petition had been affirmed on appeal.

The Ansaldis' appeal from the judgment dismissing their petition for adoption comes here with a transcript of the evidence, a report of the Department of Public Welfare recommending the adoption,[1] and the judge's findings of fact. In the circumstances we give due weight to the findings of the judge, which will not be reversed unless clearly erroneous; but we may find facts in addition to those found by him. *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 255 (1977). From our review of the record it is our conclusion that there was no error in the judge's determination that the best interests of the child would not be served by allowing the petition.

In determining the best interests of a child on a petition of this kind, much of necessity must be left to the experience, judgment and discretion of the trial judge. *Petition of the New England Home For Little Wanderers*, 367 Mass. 631 646 (1975). *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975). *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 260 (1978). See *Donnelly* v. *Donnelly*, 4 Mass. App. Ct. 162, 164 (1976). Parental consent to an adoption under § 3 is not to be dispensed with for other than substantial reasons. *Little Wanderers, supra* at 645. The best interests standard under § 3 is a flexible one and the weight to be accorded the several considerations under it will vary with the circumstances. *Little Wanderers, supra* at 644.

The underlying issue here is whether Pamela (with Ansaldi) may, in the circumstances, successfully employ

---

[1] The social worker, who was the author of the report and a witness at the hearing on the petition, conceded in her testimony that the report did not reflect her opinion that Yorke was a fit person to have the society of the child and that in her investigation she had given no consideration to Yorke's ability, capacity, fitness and readiness to assume parental responsibility for the child in approving the adoption. See G. L. c. 210, § 3(c).

an adoption petition under § 3 to cut off Yorke's right to visit with their child, granted to him a divorce decree and reaffirmed by the allowance of the latter's petition for contempt. *Yorke* v. *Yorke, supra.*

Apart from their proclivity for frequent marriage and divorce (each in short order has been married thrice) and Pamela's stubborn insistence on excluding Yorke from the life of their child, neither Pamela (and Ansaldi) nor Yorke can fairly be called an unfit parent. Each has now entered upon a marriage which appears to be satisfactory; each has demonstrated, as has Ansaldi, affection and concern for the child; and each is in a position to provide for the child's various needs including a comfortable home environment.

The record makes clear that from the outset Yorke has consistently and persistently demonstrated his readiness to assume parental responsibility for the child both through the pursuit of his visitation rights and his efforts to contribute to the support of the child until frustrated by Pamela. Moreover, the fact that he now lives in Florida with his third wife (his parents have a home in Massachusetts where he could visit with the child) has not discouraged his purpose to keep alive his right to associate with Mark despite Pamela's continuing opposition.

This is not the case of a neglectful parent whose interest in and support of his child have been casual or sporadic. Contrast *Adoption of a Minor (No. 1)*, 367 Mass. 907 (1975), the sole case relied upon by the petitioners. Nor is this a situation in which the child's best interests require severance of the parent-child relationship because of a parent's shortcomings or handicaps. See *Little Wanderers, supra; Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption, supra* at 265. The petitioners do not dispute the fact that Yorke has met the criteria for judicial consideration required under § 3(c): "the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility." Nor have the petitioners sustained their burden of showing that the devel-

opment of a relationship between Yorke and the child would not be in Mark's best interests.

The only argument of any significance advanced by the Ansaldis is that Yorke and the child are strangers to each other and that, therefore, the process of becoming reacquainted would be a traumatic experience for the child. While it is true that a child is not to be penalized by the failure of one of its parents to adhere to the terms of court decrees (see *Masters* v. *Craddock*, 4 Mass. App. Ct. 426, 428 [1976]), in the absence of any evidence of lack of "parental responsibility" on the part of Yorke his right to associate with the child should not be severed where the absence of a parent-child relationship between him and Mark has been due solely to Pamela's intransigent conduct. See *Dunne* v. *Amerigian*, 354 Mass. 368, 372 (1968).

The prospect facing Mark is commonplace among young children of remarried divorced parents—the adjustment to the presence in the life of the child of more than one father or mother figure, or both, as the case may be. That prospect, standing alone, does not warrant the exclusion from a child's life of an association with one of its natural parents which may prove to be beneficial. Depending upon the attitude of the parents, the adjustment need not be traumatic. In this case, the necessity of such an adjustment does not in our view outweigh the advantage to Mark, in the long run, of knowing and receiving a degree of care and protection from his own father.

Finally, there was no abuse of discretion in the denial of a motion brought twenty-seven days after the entry of judgment by an attorney under Mass.R.Dom.Rel.P. 24 (1975) to intervene on behalf of the child.[2] See *United States* v. *Carroll County Bd. of Educ.*, 427 F.2d 141 (5th Cir. 1970); *McClain* v. *Wagner Elec. Corp.*, 550 F.2d 1115,

[2] At oral argument it developed that the proposed intervention had been prompted by Ansaldi.

1120 (8th Cir. 1977). See generally 7A Wright & Miller, Federal Practice and Procedure 579–580 (1972). The basis for the motion was a claim that the child's interests had not been adequately represented in the adoption proceedings. In addition to the fact that a guardian ad litem had been appointed for the child, the adversary positions taken by the existing parties provided assurance that the child's interests were adequately represented. See *In re Adoption of a Minor*, 120 F.2d 720, 721 (D.C. Cir. 1941). We note also that the judge had before him a report from the Department of Public Welfare under the provisions of G. L. c. 210, § 5A, the obvious purpose of which is to protect the best interests of the child. In the circumstances we need not decide whether the motion was rightly brought under Rule 24. See Mass.R.Civ.P. 1 (365 Mass. 730 [1974]) and Mass.R.Dom.Rel.P. 1 (1975).

*Judgment affirmed.*

BROWN, J. (dissenting). The mother and stepfather petitioned for adoption by him of her son and for a change of the son's name. The mother's former husband (Yorke) intervened, opposing the motion on the ground that the adoption would cut off his visitation rights. The Probate Court judge denied the petition on the basis that (1) the adoption proceeding was part of a continuing effort by the mother to prevent Yorke from seeing the child; (2) Yorke "is equally as fit to have the society and companionship of [the child] as [the mother]," and (3) "the best interest and welfare of [the child] would not be served" by allowing the petition. The judge made a number of findings concerning the conduct of the petitioners and the interests of Yorke. However, the judge made no findings in support of his conclusion that it is in the best interests of the child to deny the petition. Further, although a guardian ad litem was appointed for the child, apparently he took no part in the proceedings and made no recommen-

dations. I, therefore, would reverse and remand the case for rehearing and further findings on the question of the best interests of the child. My reasons for this view follow.

1. The petition for adoption may not be denied solely on the basis of the mother's inequitable conduct toward her former husband, as a child may not be penalized for the inequitable conduct of the parent. *Masters* v. *Craddock*, 4 Mass. App. Ct. 426, 428 (1976).[1]

2. Yorke argues that G. L. c. 210, § 3(*a*)(ii), as appearing in St. 1972, c. 800, § 2, which provides that when a petition for adoption is filed by a person having care or custody of a child, the consent of a parent will not be required if the adoption is "in the best interests of the child," does not apply because he has visitation rights and therefore the mother does not have absolute or exclusive custody. This interpretation of the statute is incorrect, as G. L. c. 210, § 3(*a*), has been applied to this type of situation. *Adoption of a Minor (No. 1)*, 367 Mass. 907 (1975). Cf. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 642 (1975).

3. Under G. L. c. 210, § 3(*a*), the determination whether to allow the adoption must be based on "the best interests of the child, as defined in paragraph (*c*)." Paragraph (*c*) provides that in determining whether the best interests of the child will be served, the court shall consider "the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility and shall also consider the ability, capacity, fitness and readiness of the petitioners . . . ."

This statute was amended following a decision by the Supreme Judicial Court that a finding of parental unsuit-

---

[1] Cf. *Surrender of Minor Children*, 344 Mass. 230, 237 (1962), which held that a court may not revoke a surrender for adoption "without regard for the welfare of the children and solely on considerations of justice to the mother"; *Revocation of Appointment of a Guardian of a Minor*, 360 Mass. 81, 88 (1971) ( "the predominant consideration must be the welfare of the child" ).

ability without a finding of wilful desertion or neglect for a year was not an adequate basis for a decree dispensing with parental consent. See *Consent to Adoption of a Minor*, 345 Mass. 706 (1963), discussed in *Little Wanderers*, 367 Mass. at 637–638. Thus the purpose of this statute was changed to broaden "the factors the court could consider in deciding whether to proceed over the parent's objections; unsuitability besides desertion or neglect was now clearly an available ground." *Id.* at 638.

The term "best interests" of the child does not mean that two sets of parents are compared to determine which is "better" qualified economically, morally, intellectually, etc., to raise the child. *Id.* at 639–640. The presumption is that the child should stay with the natural or biological parent or parents from birth. Moreover, the right to raise one's children is constitutionally protected. See *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972), and cased cited. However, the child is also a person who is entitled to protection under the law and the Constitution, and in certain situations the rights of the parent and the child may be in conflict. In such a case the interests of the parent and child must be weighed and a determination made as to which is more critical.

Thus, the State may remove the child from the parent if the parent is harming the child, or, where two competing sets of adults are seeking custody, the natural parent may lose custody if there is a finding of a serious problem with the natural parent or if there has been a "separation so long as to permit very strong bonds to develop between the child and the prospective adoptive parents," such that the parental relationship is with the prospective adoptive parent(s) and not the natural parent(s). *Little Wanderers*, 367 Mass. at 641–642. See *Adoption of a Minor*, 343 Mass. at 296, 297–298.[2]

---

[2] Professor Robert H. Mnookin, in Child-custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 Law and Contemporary Problems 226 (Summer 1975), suggests three intermediate rules

Thus, as the Supreme Judicial Court has pointed out, the tests under G. L. c. 210, § 3(c), of "fitness . . . to assume parental responsibility" and "the best interests of the child" are interrelated, and "elements of parental 'unfitness' figure strongly in the 'best interests' test, while elements of 'best interests of the child' weigh in any consideration of whether a parent is fit to have custody of his child." *Little Wanderers*, 367 Mass. at 636–637, 641. A parent may be "fit" to assume responsibility for one child but not for another. See *id.* at 637–642, 640–641. This is true in the situation where, through no fault of the parent, there has been a separation so long that the child's parental bonds are no longer with the natural parent but are with another adult. *Id.* at 641–642. See also *Cennami* v. *Department of Pub. Welfare*, 5 Mass. App. Ct. 403, 409, 412 (1977).

The present case does not involve removal by the State of a child from the custody of a natural parent or from a stable environment, as the child here is with the mother, and the natural father who is refusing consent to adoption is not asking custody of the child. Rather, the stepfather, who has an actual parental relationship with the child, and the mother are asking that the relationship be

for resolving custody disputes between two or more individuals, each of whom claims an associational interest with the child (which he calls "private dispute settlement," as distinguished from "child protection" cases, in which a court enforces standards "believed necessary to protect the child"). His proposed rules are: (1) Custody should never be awarded to a claimant whose limitations or conduct would endanger the health of the child, applying the same standards used in child-protection cases. (2) A psychological parent (i.e., an adult who has a psychological relationship with the child from the child's perspective) is to be preferred over any claimant (including a natural parent) who, from the child's perspective is not a psychological parent. (3) Subject to the two rules above, natural parents should be preferred over others. Thus in a dispute between a natural parent and a third party, the natural parent would prevail unless the third party had a psychological relationship with the child from the child's perspective and the natural parent did not. (These rules of course do not resolve disputes between two natural parents, both of whom have a parental relationship with the child.)

made permanent and legally recognizable through adoption; the natural father, who through no fault of his own has no relationship with the child, is asking that his legal ties to the child and his visitation rights not be cut off. The natural father has not abandoned or neglected the child, nor given up his interest in seeing him. Contrast *Adoption of a Minor (No. 1)*, 367 Mass. 907 (1975); *Adoption of a Minor*, 360 Mass. 416 (1971). However, he has no present relationship with the child at all, due not only to the mother's refusal since December, 1971, to allow him to visit the child but also due to the fact that he and the child never lived together at all because he and the mother separated long before the child was born.

Yorke argues that under G. L. c. 210, § 3, the adoption should not be permitted because the probate judge found that Yorke was equally as fit as the mother to have the society and companionship of the child. However, although relative fitness of a parent is one factor, it is not the exclusive criterion under c. 210, § 3, for determining the child's best interests. Moreover, as we have seen above, the concepts of "fitness" and "best interests of the child" are interrelated, and a parent may be fit to assume parental responsibility for one child and not another.

In considering the "best interests" of the child, the Probate Court judge should have considered, among other factors, the "fitness" of the petitioner and of Yorke to assume parental responsibility, not just in the abstract, but in relation to this *particular* child. The judge should have considered the needs of the child, in light of his age, and what the positive and negative effects for the child would be of allowing or denying the petiton for adoption given the circumstances of this case.[3] In short, the judge

[3] In considering "fitness" the judge should have considered the presence or absence of parental bonds with each of the parties and the fact that should the mother suddenly die or become incapacitated, allowance or denial of the petition would determine whether the child would remain with the stepfather, the only father he has known, or go to live with Yorke, with whom he has never lived and has no relationship.

should have carefully explored the question whether in these circumstances it would be in the best interests of this child to have a legally recognized adoptive father.

4. Yorke argues that to allow the petition for adoption in this case, thereby cutting off his visitation rights, without a finding of fault on his part, would be a violation of his constitutional rights. The right to raise and have the companionship of one's children is protected by the United States Constitution. *Stanley* v. *Illinois*, 405 U.S. at 651. In *Stanley* v. *Illinois*, the United States Supreme Court held that an unwed father was denied equal protection of the laws and due process of law when his children were taken from him by the State, after their mother's death, without a hearing establishing his unfitness as a parent. 405 U.S. at 651–658. The Court stated, "The private interest . . . of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection"[4] 405 U.S. at 651. Since the father was not merely the biological father but also had raised the children, the case did not decide the issue whether biological parenthood, or biological fatherhood, alone brings protection.

In *Quilloin* v. *Walcott*, 434 U.S. 246, 256 (1978), the United States Supreme Court held that an unwed father who had never had or sought custody of his child and never had "any significant responsibility with respect to the daily supervision, education, protection, or care of the child," although he had visited the child on numerous occasions and provided gifts and occasional support, was not denied any constitutional rights when the State of Georgia permitted adoption of the child without his consent by the mother's present husband. Mr. Justice Marshall, speaking for a unanimous Court, pointed out that (1) this was not a case in which the State was attempting

---

[4] The case did not deal with the issue of the children's interest in keeping the family unit intact.

to force the breakup of a natural family over the objections of the parents and their children without some showing of unfitness, (2) nor was it "a case in which the unwed father at any time had, or sought, actual or legal custody of his child. (3) Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except the appellant." 434 U.S. at 255. Distinguishing this situation from that of a father who has been married (whose consent would be required for adoption under Georgia law), Mr. Justice Marshall emphasized that the father had never had and was not seeking legal custody of the child, whereas "even a father whose marriage has broken apart will have borne full responsibility for the rearing of his children during the period of the marriage." *Ibid.*

Based on *Stanley* v. *Illinois* and *Quilloin* v. *Walcott*, I conclude that (1) where a parent, married or unmarried, has helped raise and has a relationship with his or her child, the State may not remove the child from the custody of the parent without a showing of parental unfitness; (2) in the case of an infant before psychological ties have been formed, the State (as opposed to the other natural parent) cannot remove a child from a parent, married or unmarried, if the parents had or sought custody of the child, without a showing of parental unfitness; (3) where an unmarried parent has never had, and does not seek, custody of the child, the State may decide whether to permit visitation and whether to permit adoption without that person's consent on the basis of the best interests of the child. See *Quilloin* v. *Walcott, supra; Gardner* v. *Rothman*, 370 Mass. 79, 81 (1976).

Unlike the father in *Stanley* v. *Illinois*, Yorke has never lived with nor helped raise his child. This has been due not only to the refusal of the mother to permit him to visit, but also to the fact that they were separated before

the child was born and he never had (or sought) custody of the child. Moreover, this is not a case where the State, as in *Stanley* v. *Illinois*, is seeking to remove the child from the custody of the father; rather it is a dispute between the two natural parents which they have been unable to resolve. Yorke differs from the father in *Quilloin* v. *Walcott*, in that that case involved an unwed father, whereas the father here was married to the mother for a brief period of time. However, in all other respects the facts here are similar to those in *Quilloin* v. *Walcott*: the child is with the natural mother; the State is not seeking to remove the child from the custody of a natural parent; the father never had or sought custody of the child, never lived with the child, and never shared in the responsibility for raising the child.[5] The critical factor in a case such as this is not the marital relationship per se but rather the existence of a parental relationship with the child, which would ordinarily exist as a result of a marital relationship.[6] In the usual situation involving divorced parents, both would probably have shared in the parenting during the marital relationship.[7] In the unusual fact situation present here, the interest of the parent in establishing a relationship with a child he does not know must be weighed against the interests (if any) of the child[8] which would be protected by allowing the petition

[5] The mother in *Quilloin* v. *Walcott*, had allowed the natural father to visit over a longer period of time than here, first refusing to permit visitation a short time before bringing the petition for adoption.

[6] Such a parental relationship could also exist outside a marital relationship, as in *Stanley* v. *Illinois*, where the unwed father lived with and helped raise his children.

[7] Moreover, both would therefore have a parental relationship with the child and thus be equally "fit" in that respect to assume parental responsibility for the child, under the tests set out in G. L. c. 210, § 3.

[8] The child may also have an interest in knowing who his natural father is. However, it is also possible that it would be detrimental for the child at this age, and under present circumstances, to allow Yorke to visit, whereas at a later age the child may wish to establish a relationship with him.

for adoption.[9] In sum, I conclude that the allowance of the petition for adoption in this case is a constitutionally permissible decision if it is found that the best interests of the child warrant it.

5. Yorke's argument that the award of visitation rights in the divorce decree is res judicata as to the best interests of the child is incorrect. Orders for care and custody are subject to revision if the welfare of the child warrants it. *Donnelly* v. *Donnelly*, 4 Mass. App. Ct. 162, 164 (1976). *Masters* v. *Craddock*, 4 Mass. App. Ct. at 429, and authorities cited. See also *Cennami* v. *Department of Pub. Welfare*, 5 Mass. App. Ct. at 408–409.

In conclusion, I am of the opinion that the material facts reported by the judge are insufficient as matter of law to support the denial of the petition for adoption by the stepfather and the mother. See *Adoption of a Minor (No. 2)*, 367 Mass. 684, 687 (1975). The case should be remanded for consideration of the best interests of the child. The guardian ad litem should be directed to take part in the proceedings and to prepare a report setting out the interests of the child. G. L. c. 215, § 56A. See *Jones* v. *Jones*, 349 Mass. 259, 264 (1965). The judge should then reconsider the petition in light of the principles set out herein.

---

[9] I note also that, like Massachusetts (see G. L. c. 119, § 39D), some other jurisdictions are beginning to recognize the importance of maintaining other ties with relatives for children where adoption occurs following the loss of one of the natural parents by death or divorce. In California grandparents have been given visitation rights in such circumstances if the visitation is found to be in the best interests of the child. See *Roquemore* v. *Roquemore*, 275 Cal. App. 2d 912, 916–917 (1969); *Reeves* v. *Bailey*, 53 Cal. App. 3d 1019, 1025–1026 (1975). However, such visitation is viewed as a flexible device to promote the welfare of the child and not a natural right derived from parenthood. 53 Cal. App. 3d at 1026. A Surrogate's Court in New York, under its equity jurisdiction, awarded a father visitation rights in conjunction with approving the adoption of his daughter by her stepfather. *In re Adoption of N*, 78 Misc. 2d 105, 108–111 (N.Y. 1974). That court quoted Justice Oliver Wendell Holmes, "The life of the law has not been logic; it has been experience." 78 Misc. 2d at 110. However, such a solution seems improbable in the present case because of the hostility between the parties.