GUARDIANSHIP OF A MINOR.

Worcester.  December 18, 1984. — February 12, 1985.

Present: BROWN, KASS, & FINE, JJ.

*Parent and Child,* Custody of minor. *Minor,* Custody. *Guardian,* Of minor.

In a proceeding on a petition by a four year old child's natural parents to
remove the maternal grandmother as the child's guardian, the judge's
findings that, at the time the child was six months old, the parents
disappeared for two years, that, upon their return to live some thirty
miles from the grandmother's home they remained indifferent to the
child, and that the child regarded the parents as frightening strangers,
warranted his conclusions that the parents were not currently fit to have
custody of the child and that the grandmother's guardianship ought not
to be terminated at the present time. [335-338]

PETITION for removal of a guardian, filed in the Worcester
Division of the Probate and Family Court Department on De-
cember 9, 1982.

The case was heard by *William J. McManus,* J.

*Kathleen A. Townsend* for the parents.

*Vincent Pusateri* for the guardian.

KASS, J. From the age of four months, her maternal grand-
parents[1] had raised the minor, whom we shall call Laurie, as
if she were their daughter. At the time of a hearing in January,
1984, on the natural parents' petition under G. L. c. 201, § 33,
to remove the maternal grandmother as Laurie's guardian, the
child was four years old. A judge of a Probate Court, acting
upon a clear and convincing evidence standard, found that the
natural parents were unfit, and denied the petition to remove
the grandmother as guardian. See *Santosky* v. *Kramer,* 455

---

[1] The maternal grandmother was the stepmother of the natural mother of
the child. The grandmother, however, had raised the mother from the age
of four.

U.S. 745, 768-769 (1982); *Custody of a Minor (No. 2)*, 392 Mass. 719, 725 (1984).

We summarize subsidiary findings of the judge, for which there is support in the record. The grandmother was appointed a temporary guardian for Laurie when the latter was four months old. Even earlier, i.e., during earliest infancy, the mother had entrusted the child to the grandmother. The months following Laurie's birth were a period of family chaos for the parents. The father drank excessively and became violent. He was incapable of working and was destructive at home. Such was the situation at the parents' home that in February, 1980, when Laurie was five months old, the mother left the father and moved in with her parents. At that time the mother showed little interest in the baby and left her care to the grandmother.

In March, 1980, the mother vanished without parting words to her parents or to her child. She broke her silence close to two years later, in January, 1982, with a telephone call to the grandparents to inquire about Laurie's baby clothes, which she needed for an expected second child. The mother, who explained that she was back with the father and living some thirty miles away from her maternal home, made no inquiry about Laurie. In the meantime, the temporary guardianship had ripened into one not so qualified. That guardianship appears to have been established on the basis of the parents' tacit consent, rather than a determination of unfitness, though abandonment might well have been thought of at the time as current unfitness, per se. In the following months the parents made no requests to see Laurie and first saw her on July 4, 1982, at a family outing to which the grandparents had invited them. Neither parent had much to do with Laurie at the outing, and, indeed, the father vanished to fish. Laurie always referred to the grandparents as "mommy and daddy" and never articulated recognition of her real parents as mother and father. The parents acquiesced in this. There was no further contact between parents and child until October, 1982. That month the mother visited at the grandparents' home twice, occasions on which she again virtually ignored the child.

.

During 1983, the mother saw Laurie on but two or three occasions. After October, 1983, the parents failed to come to see Laurie or to arrange for her to visit with them. Through the holiday season in December, 1983, the parents made no contact with Laurie, did not send a gift or acknowledge her in any way, and, as during Laurie's entire life, offered no financial or emotional support to the child.

Relying on the history of abandonment as a prognostication, the contemporaneous barren quality of the contact between the parents and Laurie in 1983 (the hearing was, as we have noted, in January, 1984), and the parents' disinterest until they initiated legal steps to reestablish a relationship with Laurie, the judge concluded that the natural mother and father were not fit parents for Laurie in the statutory sense. He placed some emphasis on the child's adverse reactions to encounters with the parents in 1982 and 1983. Following them, the judge found, the child had experienced nightmares from which she awoke screaming and upset. The reaction was a curious one if, indeed, Laurie did not know her mother and father as such. Perhaps her reaction was evidence of unspoken recognition. The judge also found that the grandparents had provided a warm and loving home, full of appropriate stimuli, and that Laurie was doing well physically and emotionally. She had a pet rabbit and a garden; attended a Head Start program in which the grandmother was involved; and attended a Sunday school at which the grandmother was a teacher. Should the child be placed in the care of her parents, the judge found, it would adversely affect her mental and emotional health and "endanger her well being."

On the other hand there was evidence, which the judge appears to have weighed lightly, that turmoil no longer attended the family life of the parents. Each parent had secured stable employment. Three more children had been born to them and, from accounts furnished by a family service officer and health care providers, those children were cared for acceptably. Their home was characterized as "clean and neat."

Although the literal statutory ground for terminating a guardianship under G. L. c. 201, § 33, presupposes unsuitability of

the guardian, the question of suitability resolves itself in a case such as this into an inquiry about the current fitness of the natural parents. *Duclos* v. *Edwards*, 344 Mass. 544, 546 (1962). *Bezio* v. *Patenaude*, 381 Mass. 563, 573 (1980). See also *Freeman* v. *Chaplic*, 388 Mass. 398, 404-407 (1983). Unfitness is a complex idea. Incompetence as a parent, expressed by neglect, abuse, violence, indifference, or absence of feeling toward the child, is certainly a form of unfitness. *Richards* v. *Forrest*, 278 Mass. 547, 552-553 (1932). Courts are, as well, to evaluate fitness in relation to the best interests of the child. See *Petition of the New England Home for Little Wanders to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975). So it is that parents may be regarded as unfit for custody of a particular child if " 'some factor such as lengthy separation and a corresponding growth in the ties between the child . . . [and the custodian] indicate[s] that the child would be hurt by being returned to the natural parents.' " *Custody of a Minor*, 389 Mass. 755, 766 (1983), and cases cited. See also *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 & n.8 (1984); *Petition for Revocation of a Judgment for Adoption of a Minor*, 393 Mass. 556, 559 (1984); *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 656, 661 (1984). Parents may be fit to bring up one child and not another. *Ibid.*, and cases therein cited. Of the factors which the court must consider, the most powerful is the premise that biological parents have a fundamental right to the custody of their children. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 799 (1983). *Petition of the Catholic Charitable Bureau to Dispense with Consent to Adoption*, 18 Mass. App. Ct. at 662. In resolving the ultimate question of custody, however, that factor is not absolute, and it, together with all other factors, should be considered with primary reference to the welfare of the child. *Bezio* v. *Patenaude*, 381 Mass. at 574-575. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. at 799.

Against this background of decided cases, we measure the findings and judgment below. Factually, the case is akin to *Wilkins* v. *Wilkins*, 324 Mass. 261, 263 (1949), in which the visits of the child's parents had been infrequent and induced "screaming nightmares," there was a close bond between child and guardian, and return to the parents was thought to be likely to cause injury to the child. Abandonment of the child, as occurred in the instant case, is a factor, although not a conclusive one, depending on the reasons for the separation and the current mental, physical, and economic health of the parents. See, e.g., *Duclos* v. *Edwards*, 344 Mass. at 545-546; *Bezio* v. *Patenaude*, 381 Mass. at 577. The judge could consider that the parents went beyond relinquishment of custody; they simply disappeared. Past conduct, as we have observed, may tell something about the future but could be only history. More significant was the shallow interest which the parents had displayed in Laurie since their return to a home thirty miles away from where Laurie lived. The parents owned or had ready access to a car and a telephone. Yet they made only a handful of visits and failed to respond to several invitations from the grandparents. When they did visit, they gave little attention to the daughter they purport to want to bring up. Compare *Prindle* v. *Fisk*, 2 Mass. App. Ct. 843, 844 (1974), with *Kauch, petitioners*, 358 Mass. 327, 330-331 (1970), and *Matter of Carson*, 6 Mass. App. Ct. 665, 668-669 (1978), aff'd sub nom. *Adoption of a Minor*, 378 Mass. 793 (1979). The judge could also take into account that Laurie regarded her parents as frightening strangers. On balance, we think that the supportable findings of the judge warranted his conclusion that the parents were not currently fit to have custody of the child and that the guardianship ought not at this time be terminated. The judgment we affirm speaks only to the present, not the future. Display by the parents of interest in Laurie beyond assertion of a legal right and other changes in circumstances may in the future warrant different custody arrangements.[2] Some consist-

---

[2] In arriving at his judgment, the judge may have taken into account that the parents' family unit, which included three children under the age of

ent visitation by the parents would, for example, be a manifestation of interest. If the parents and the guardian cannot agree on times and the manner of visitation, it is, of course, open to the parents to seek the assistance of the Probate Court in arranging for visitation.

*Judgment affirmed.*

---

four, given the mother's and father's troubled history from 1979 to late 1982, was still fragile in January, 1984, and that the parents were, therefore, poorly equipped to cope with the difficulty of caring for another young child who is essentially a stranger to them.